MARIO M. MEDICI, PLAINTIFF, AND MADISON PROPERTY COM-
PANY NO. 4, INTERVENOR-APPELLANT, v. BPR COMPANY,
A LIMITED PARTNERSHIP, DEFENDANT-RESPONDENT,
AND BOARD OF ADJUSTMENT OF SOUTH PLAINFIELD AND
MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH
PLAINFIELD, DEFENDANTS.

Argued October 20, 1986—Decided June 3, 1987.

1

2

*Daniel S. Bernstein* argued the cause for appellant (*Bernstein, Hoffman & Clark,* attorneys; *Daniel S. Bernstein* and *Suzanne T. Bogad,* on the brief).

*Carmine D. Campanile* argued the cause for respondent (*Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

This case invites our reconsideration, for the first time since *Kohl v. Mayor of Fair Lawn,* 50 *N.J.* 268 (1967), of the factors that should guide a municipal board of adjustment considering

a use-variance application for a commercial use that does not *"inherently* serve[ ] the public good." *Id.* at 279. In this case the proposed use is a four-story motel, the fourth variance application to build a motel considered by the Board of Adjustment of South Plainfield (Board) in recent years. This application, as well as the three prior applications, was granted by the Board. The Borough's zoning ordinance does not permit motels or hotels in any zoning district.

We now reaffirm the holding in *Kohl* that if the use for which a variance is sought is not one that inherently serves the public good, the applicant must prove and the board must specifically find that the use promotes the general welfare because the proposed site is particularly suitable for the proposed use.[1] In addition, in view of the 1985 amendments to the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –112, set forth in *N.J.S.A.* 40:55D–89, –89.1 (requiring periodic review by the governing body of master plans and zoning ordinances and establishing a presumption of unreasonableness for ordinances not so reviewed) and *N.J.S.A.* 40:55D–70.1 (requiring annual reports by boards of adjustment of variance requests and recommendations for ordinance revisions), we deem it appropriate to require an enhanced quality of proof, as well as clear and specific findings by the board of adjustment, that the grant of a use variance is not inconsistent with the intent and purpose of the master plan and zoning ordinance. Such proofs and findings must satisfactorily reconcile the grant of a use variance with the ordinance's continued omission of the proposed use from those permitted in the zone, and thereby provide a more substantive basis for the typically conclusory determination that the variance "will not substantially impair the intent and purpose of the zone plan and zoning ordinance." *N.J.S.A.* 40:55D–70(d). This added requirement will apply in all

---

[1]Alternatively, the statutory special reasons standard can also be addressed by proof of undue hardship, *i.e.,* that the property cannot reasonably be developed with a conforming use. *See infra* note 9 at 17.

use-variance cases. We anticipate that its application will not significantly limit the use-variance mechanism, but will narrow to some extent the discretion of boards of adjustment in reviewing use-variance appeals for uses that are deliberately excluded by the governing body from those permitted by the zoning ordinance. It will also effectuate the legislature's apparent objective of encouraging municipalities to make zoning decisions by ordinance rather than by variance.

I

BPR Company ("BPR" or "Applicant"), a limited partnership, is the contract-purchaser of a U-shaped parcel of property consisting of almost nine acres, and located at the intersection of Hamilton Boulevard and South Clinton Avenue in the Borough of South Plainfield ("Borough" or "South Plainfield"). The property is in close proximity to Route 287, an interstate highway that traverses the southerly portion of the Borough. The site is located in the Borough's M-3 industrial zone, the least restrictive of three industrial zones established by the Zoning Ordinance. In addition to the uses permitted in the two more restrictive zones, which include office buildings, scientific or research laboratories, various light-manufacturing uses, and storage yards, the M-3 zone permits a far wider variety of manufacturing uses than are allowed in the other industrial zoning districts. No zoning district within the Borough permits motels or hotels. The Zoning Ordinance was comprehensively revised in 1978, and has been amended several times since 1978, but none of the amendments is pertinent to this litigation.

In February 1984, BPR applied to the Board of Adjustment for a use variance to permit the construction of a four-story, 116-room motel, with a restaurant, on a portion of the property. It contemplated construction of an office building—a permitted use—on the balance of the property although the office building proposal was not submitted to the Board for consideration.

At the public hearing in March 1984, BPR presented four witnesses: an architect, a traffic consultant, an engineer, and a planner. No one testified in opposition to the application. The architect described the proposed design and exterior appearance of the motel, the site location, and the sufficiency of the on-site parking. He offered no testimony on the issue of "special reasons." His testimony concerning the "negative criteria" was limited to the following exchange:

Q. It would have no detrimental effect on either the purpose or intent of the ordinance?

A. Not at all.

The traffic consultant, Robert Nilsen, testified generally as to traffic conditions affecting the site. Responding to a direct question concerning the negative criteria, he stated that the application, from a traffic standpoint, would not adversely affect the zone plan or zoning ordinance. The only testimony minimally relevant to the issue of special reasons was his statement that

[t]his happens to be a very, very good type of use, based on the configuration of the lot, simply because if there are any activities in the office building that may have some relationship to the hotel or the restaurant, those movements between the two can occur without ever having to touch the street system. That is, in my opinion, a positive feature of this site, the office building being on the south leg of the U and the hotel and restaurant on the north leg of the U.

An engineer testified about the topography of the site, as well as the proposed drainage, sewerage, parking, and land-scaping. Like the preceding witnesses, he was asked a direct question about the negative criteria. He stated that from an engineering perspective, the application would not adversely affect the zone plan or zoning ordinance.

The last witness to testify on behalf of the applicant was the planner, Thomas E. Sheehan. He described the adjacent uses. The planner counted six commercial uses, twenty-three light industrial parcels, and six vacant sites within 1,000 feet of the site. The witness indicated that within a half mile of the property is a 192–room Holiday Inn and a 144–room Howard Johnson Motor Lodge. An approved 140–room Econo Lodge is

to be constructed within 400 feet of the site. Each of these motels was authorized by a use variance granted by the Board of Adjustment.[2]

The planning expert testified that the site was located within a

transitional land use area that is taking advantage of the marketability and the identification of uses that come with the highway intersection, the highway access points that are either four-tenths of a mile to the west or one and three tenths of a mile to the east, the interchanges to 287, specifically.

Describing the prevailing uses as a "commercial-service-type complex of uses," he testified that the proposed use "serves the[ ] complementary needs [of the surrounding industrial district and the transregional market] by adding hotel space * * * [and] restaurant facilities," and "provides a conveniently located place for neighboring business people to conduct business meetings, provide dining, amenities to lodge out-of-town clients * * * and management type of people." Although he had no detailed knowledge of vacancy rates at the existing motels and had not undertaken a market study, he stated that "[a] clear need, in my mind, exists for this type of use for this location to serve the very large development of office floor space that has developed in this area." Although he did not testify that the specific site was particularly suitable for the proposed use, he characterized the U-shaped lot as "unique" and "unsuitable, in my opinion, for industrial uses which would require the large unbroken tracts of land."

Regarding the negative criteria, he testified that the proposed motel and office are "not incompatible with the neighboring land uses," and do not "alter or adjust the integrity of that zone."

At the conclusion of the hearing, the Board unanimously approved the variance. Its resolution recited that "[t]he appli-

---

[2]The record does not reveal when the variances for the Howard Johnson and Holiday Inn motels were granted. The variance for the Econo Lodge was granted July 27, 1982.

cant has demonstrated that there is a present and existing need for good motel uses in the Borough," and concluded that such "need for good motel accommodations" constituted special reasons to support the relief requested. The resolution also contained a conclusory statement that the grant of the variance would not cause "substantial detriment to the intent and purpose of the Zoning Ordinance."

Plaintiff Medici, a property owner in the area, appealed the Board's decision to the governing body. *See N.J.S.A.* 40:55D–17(a). The Mayor and Council upheld the grant of the variance and adopted a conclusory resolution affirming the existence of special reasons and satisfaction of the negative criteria.

Medici then instituted this action in the Law Division challenging the validity of the variance granted by the Board of Adjustment and affirmed by the governing body. Prior to trial, Medici resolved his differences with BPR, but respondent Madison Property Company No. 4 (Madison) was granted permission to intervene as plaintiff before a stipulation of dismissal was filed.[3] The trial court determined that although the negative criteria were satisfied, the record before the Board did not contain adequate proof of special reasons to support the grant of the variance. Specifically, the trial court focused on the absence of proof in the record or findings by the Board that the proposed site was "particularly suitable" for a motel, and, accordingly, set aside the grant of the variance. The Appellate Division reversed, concluding that it was neither arbitrary, capricious, or unreasonable for the Board to have determined from the evidence that there was a "public need" for a motel in the area and that the site, because of its shape and its proximity to highways and commercial development, was "particularly

---

[3]Madison certified that it had purchased from Medici Lot 1.02, Block 535 located on Hamilton Boulevard across from BPR's site, and that it held a building permit to construct an Econo-Lodge motel on its property. Medici had applied for and been granted a variance to construct the motel by the Board of Adjustment.

suitable" for use as a motel.[4] We granted certification, 104 *N.J.* 418 (1986), and now reverse.

## II

In assessing whether a course-correction is necessary in the standards governing judicial review of the grant of use variances, we adhere to Justice Holmes' counsel that "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 *U.S.* 345, 349, 41 *S.Ct.* 506, 507, 65 *L.Ed.* 963, 983 (1921). The lessons of nearly four decades' experience with use variances based on "special reasons" enhance our understanding of the prevailing standards. *See generally* Williams, *American Land Planning Law*, §§ 138.01–.05, 149.16–.21 (1985) (summarizing New Jersey use-variance decisions).

Prior to the 1948 amendments to the land-use statutes, *L.* 1948, *c.* 305, the grant of a use variance required a finding of undue hardship. *See Monmouth Lumber Co. v. Ocean Township*, 9 *N.J.* 64, 76 (1952); Cunningham, "Control of Land Use in New Jersey By Means of Zoning," 14 *Rutgers L.Rev.* 37, 74–75 (1959). Although undefined in the statute, the existence of "undue hardship" in the use-variance context contemplated proof that the property "is not reasonably adapted to a conforming use[.]" *Brandon v. Montclair*, 124 *N.J.L.* 135, 149 (Sup.Ct.), aff'd, 125 *N.J.L.* 367 (E. & A. 1940); *accord Stolz v. Ellenstein*, 7 *N.J.* 291, 295–96 (1951).

The 1948 amendments introduced the phrase "special reasons" as the standard that should guide use-variance recommendations by local boards of adjustment to their governing

---

[4]The Appellate Division also disapproved of the trial court's reference to a standard of "unique" rather than "particular" suitability for the proposed use. As we read the trial court's opinion, the isolated reference to "unique" suitability was intended to be synonomous with the test of "particular suitability" endorsed by the Appellate Division. We reject petitioner's contention that *Kohl v. Fair Lawn, supra,* 50 *N.J.* at 279–80, requires proof of "unique" rather than "particular" suitability to sustain a finding of special reasons.

bodies. In *Monmouth Lumber Co. v. Ocean Township, supra,* 9 *N.J.* 64, the 1948 amendments were interpreted as eliminating the need to prove undue hardship on use-variance appeals:

> The amendatory acts indicate a legislative intent to withdraw from *R.S.* 40:55–39d the application of the requirement for proof of "unnecessary hardship" and to substitute therefor discretionary authority to grant a variance "in particular cases and for special reasons." This is indicated by the fact that in subsection c (as amended) the Legislature retained the words "exceptional and undue hardship" where the board of adjustment is empowered to *authorize* a variance, but in subsection d (which formerly contained no legislative expression of the basis necessary for the board's *recommendation* of variance to the governing body) the Legislature inserted the words "in particular cases and for special reasons." It is settled that statutes should be accorded that construction which will give effect to every word expressed by the Legislature therein. This requires construction of *R.S.* 40:55–39, as amended, *supra,* to mean that where the board of ajustment [sic] may *authorize* a variance there must be proof of "exceptional and undue hardship," but where it may *recommend* a variance to the governing body of the municipality it may do so, in particular cases, "for special reasons" which may include, but do not necessarily require, proof of unnecessary hardship as a special reason warranting a variance. In these latter instances, however, the governing body has discretionary power to approve or disapprove the recommendation. [*Id.* at 77.]

In *Ward v. Scott,* 11 *N.J.* 117 (1952), the Court, although sharply divided, reaffirmed its dictum in *Monmouth Lumber* that undue hardship was no longer a prerequisite to the grant of a use variance. *Id.* at 122. The Court also rejected the contention that the newly-enacted standard for use variances was unconstitutionally vague. *Id.* at 127. The Court found that the meaning of the statutory phrase "in particular cases and for special reasons" was circumscribed by the general purposes of zoning, citing *R.S.* 40:55–32, *id.* at 125–26, and that the application of the standard was restrained by the "fixed and far reaching protective restriction * * * against allowance of the variance unless it can be granted 'without substantial detriment to the public good and will not impair the intent and purpose of the zone plan and zoning ordinance.' " *Id.* at 126.[5]

---

[5]After the Court's initial decision in *Ward v. Scott, supra,* 11 *N.J.* 117, the matter was remanded to the municipal Board of Adjustment. The Board adopted a more detailed resolution recommending the variance and the town

There remained for the judiciary the task of infusing substantive meaning into the "special reasons" standard that had been newly crafted by the Legislature. The first significant opportunity came in *Andrews v. Ocean Township Bd. of Adjustment,* 30 *N.J.* 245 (1959),[6] a case involving a challenge to a use variance granted by the municipality to permit the use of residentially-zoned premises for a parochial school. The critical issue was whether special reasons existed to support the variance. Chief Justice Weintraub observed that except for the purposes of zoning set forth in *R.S.* 40:55–32, no definition of special reasons had been attempted. *Id.* at 251 (citing *Grimley v. Ridgewood,* 45 *N.J.Super.* 574, 581 (App.Div.), certif. denied, 25 *N.J.* 102 (1957)). "In the nature of the subject, a precise formula is not feasible. Each case must turn upon its own circumstances." *Id.*

Adopting the holding in *Ward v. Scott, supra,* that the phrase "special reasons" "gained validating content from the purposes of zoning," *id.* at 250, the Court found it indisputable that the education of children furthered the general welfare and that a need existed for additional parochial-school facilities. *Id.*

---

council approved the Board's recommendation. In its second *Ward v. Scott* opinion, 16 *N.J.* 16 (1954), the Court upheld the grant of the variance.

[6]The Court's decisions between *Ward v. Scott* and *Andrews* suggest that members of the Court were concerned about the effect of the holding in *Ward v. Scott, supra,* that undue hardship is not a prerequisite to the grant of a use variance. In *Ranney v. Istituto Pontificio Delle Maestre Filippini,* 20 *N.J.* 189 (1955), the Court in a 4–3 decision set aside a use variance granted by the Board of Adjustment and Township Committee of Morris Township for the construction of an addition to a facility located on a one-hundred-acre site and dedicated to the training of parochial-school teachers. In *Moriarty v. Pozner,* 21 *N.J.* 199 (1956), the Court, again by a 4–3 vote, set aside a variance for a neighborhood shopping center granted by the Township of North Bergen after recommendation by the Board of Adjustment. In *Grundlehner v. Dangler,* 29 *N.J.* 256 (1959), four members of the Court were willing to sustain a variance to expand a nonconforming funeral home in a residential zone. One member of the Court voted to deny the variance, and one Justice concurred to the extent that the matter was to be remanded to the Board of Adjustment for further factual findings.

at 251. The Court therefore concluded that the record was consistent with the municipality's determination that special reasons existed to support the variance. *Id.* Observing that the negative criteria had also been satisfied, the Court sustained the grant of the variance. In a much-quoted dissent, Justice Hall criticized the Court for holding

> that a variance must be sustained, as far as the "special reasons" requirement is concerned, if the board of adjustment finds from the proofs that the proposed use will promote the "general welfare," *i.e.*, that it is a desirable thing for the community or a segment of it at the location requested. Such a broad view, it seems to me, may well result in the theory being applicable by the same reasoning not only to the eminently desirable parish school as here, but also to a commercial enterprise in a residential zone, with paramount affirmative consideration given only to the general desirability or convenience of it and with little regard to the zoning effects at such location. In other words, zoning considerations are relegated to a minor role.
>
>     \*      \*      \*      \*      \*      \*      \*      \*
>
> By the sweep of the majority opinion it appears we will have almost untrammeled discretion in the local administrative agencies to grant a use variance under so-called standards so broad that almost every variance allowed will have to be sustained. The use restrictions of the ordinance have become a rather coarse sieve. I am convinced that the basic concept of use zoning by districts in accordance with a comprehensive plan will consequently, for all practical purposes, disappear and that spot zoning has in effect been given legal blessing. [*Id.* at 256–57.] [7]

The Court's holding in *Andrews v. Ocean Township Bd. of Adjustment, supra,* that the special-reasons standard was inherently satisfied by institutional-type uses furthering the general welfare was solidified by a number of subsequent decisions adopting the *Andrews* rationale. *See, e.g., Black v. Montclair,* 34 *N.J.* 105 (1961) (addition to parochial-school building in residential zone); *Burton v. Montclair,* 40 *N.J.* 1 (1963) (private school in residential zones); *Yahnel v. Board of Adjustment of Jamesburg,* 79 *N.J.Super.* 509 (App.Div.1963) (telephone-equipment building in residential zone) certif. denied, 41 *N.J.* 116; *Kunzler v. Hoffman,* 48 *N.J.* 277 (1966) (private hospital for the

---

[7] A comprehensive analysis of the Court's opinion in *Andrews* appears in Sussna, "Zoning in Transition," 82 *N.J.L.J.* 473, Sept. 24, 1959.

emotionally disturbed in residential zone); *DeSimone v. Greater Englewood Housing Corp. No. 1*, 56 *N.J.* 428 (1970) (public or semi-public low-cost housing project in one-family residential zone).

In the fifteen-year period between *Ward v. Scott*, and *Kohl v. Fair Lawn*, our courts were reluctant to interpret expansively the statutory special-reasons standard when the proposed use was commercial. Since commercial uses did not necessarily promote the general welfare, commercial-use variances granted by municipalities were frequently set aside for a lack of proof of special reasons, and municipal denials of commercial variances were routinely upheld. *See, e.g., Mayer v. Montclair Bd. of Adjustment*, 32 *N.J.* 130 (1960) (reversing judgments of Appellate Division and Law Division sustaining variance for automobile junkyard in light-industrial zone; Court upheld municipality's finding that applicant failed to prove special reasons); *Mahler v. Board of Adjustment of Fair Lawn*, 94 *N.J.Super.* 173 (App. Div.1967) (reversing Law Division decision that set aside the municipal denial of a use variance for a home professional office for a dentist), aff'd, 55 *N.J.* 1 (1969); *Wajdengart v. Broadway-Thirty-Third Corp.*, 66 *N.J.Super.* 346 (App.Div. 1961) (reversing grant of a variance to permit offstreet parking in residential zone); *Suesserman v. Newark Bd. of Adjustment*, 61 *N.J.Super.* 28 (App.Div.1960) (reversing the grant of a variance to create a parking lot for a catering establishment in a residential zone); *Schoelpple v. Woodbridge Township*, 60 *N.J.Super.* 146 (App.Div.1960) (reversing the grant of a variance to permit construction of supermarket in residential zone); *Mocco v. Job*, 56 *N.J.Super.* 468 (App.Div.1959) (reversing grant of variance to permit second floor of tavern to be used for dancing); *Whitehead v. Kearny Zoning Bd. of Adjustment*, 51 *N.J.Super.* 560 (App.Div.1958) (reversing grant of variance to permit construction of swimming pool to supplement private tennis club facilities); *Izenberg v. Board of Adjustment of Paterson*, 35 *N.J.Super.* 583 (App.Div.1955) (reversing grant of variance for six-story apartment house in

one-family residential zone); *Skaf v. Zoning Bd. of Adjustment of Asbury Park*, 35 *N.J.Super.* 215 (App.Div.1955) (reversing grant of variance for women's club facility to be located in residential zone). *But cf. Mistretta v. City of Newark*, 33 *N.J.Super.* 205 (Law Div.1954) (upholding grant of variance to permit bank to construct a parking area in residential zone).

Prior to *Kohl v. Fair Lawn*, the most significant non-institutional use variance case was *Kramer v. Board of Adjustment, Sea Girt*, 45 *N.J.* 268 (1965). There, the application before the board of adjustment sought a variance to permit the replacement of a deteriorating beach-front hotel in a residential zone with a new, smaller, air-conditioned, fireproof hotel that would be more attractive and would provide more adequate on-site parking facilities. Despite strenuous opposition from neighbors, the governing body accepted the Board's recommendation and granted the variance. *Id.* at 274. The Board determined that the property was unsuitable for residential use and particularly suitable for use as a hotel. *Id.* at 287. The Board also found that the "blight of a deteriorating old hotel is a more serious hazard to Sea Girt as a residential community than a new modern hotel." *Id.* at 293.

The Law Division sustained the grant of the variance, relying on *Yahnel v. Jamesburg, supra,* 79 *N.J.Super.* at 518, for the principle that proof of either the inutility of property for a permitted use or the particular suitability of property for the proposed use could constitute a special reason to support a use variance. *See Kramer v. Sea Girt, supra,* 45 *N.J.* at 286. This Court certified the appeal before argument in the Appellate Division. It affirmed the grant of the variance substantially on the basis of the Law Division opinion, and emphasized its resolve to require judicial deference, in variance cases, to the discretionary judgments of local officials:

> In these highly controversial and oftentimes debatable zoning cases the courts must recognize that local officials "who are thoroughly familiar with their community's characteristics and interests and are the proper respresentatives of its people are undoubtedly the best equipped to pass initially on such

applications for variance." *Ward v. Scott,* 16 *N.J.* 16, 23 (1954). Therefore, the law presumes that boards of adjustment and municipal governing bodies will act fairly and with proper motives and for valid reasons.

\* \* \* \* \* \* \* \*

Such public bodies, because of their peculiar knowledge of local conditions must be allowed wide latitude in the exercise of delegated discretion. Courts cannot substitute an independent judgment for that of the boards in areas of factual disputes; neither will they exercise anew the original jurisdiction of such boards or trespass on their administrative work. So long as the power exists to do the act complained of and there is substantial evidence to support it, the judicial branch of the government cannot interfere. A local zoning determination will be set aside only when it is arbitrary, capricious or unreasonable. Even when doubt is entertained as to the wisdom of the action, or as to some part of it, there can be no judicial declaration of invalidity in the absence of clear abuse of discretion by the public agencies involved. [*Id.* at 296–97.]

In *Kohl v. Fair Lawn, supra,* 50 *N.J.* 268, the Court was careful to harmonize the variance upheld in *Kramer* with the standard announced in *Kohl* for determining the existence of special reasons in commercial use-variance cases. *Id.* at 282–83. The *Kohl* case involved a challenge to a use variance granted by the Borough of Fair Lawn to permit expansion of a nonconforming use. The applicant was Fair Lawn Dairies, a milk processing business that had operated in the municipality for forty years. *Id.* at 270. The proposed expansion involved construction of at least 35,180 square feet of floor space, and included additions to the processing plant and storage building, a new loading dock, and a cinder-block wall enclosing the premises.[8] *Id.* at 272–73. The variance was granted by the governing body after recommendation by the Board of Adjustment. The Board's resolution contained no specific finding of special reasons but referred to enhanced fire safety, improved appearance, noise reduction and the importance of assuring an adequate milk supply as factors supporting the grant of the variance. *Id.* at 274. The Law Division upheld the grant of the variance and the Appellate Division affirmed. *Id.*

---

[8]The Court noted that by its calculations the expansion would add 57,605 square feet rather than the 35,180 square feet acknowledged by the applicant's architect. *Id.* at 273 n. 1.

This Court viewed as insufficient the factors relied on by the Board to satisfy the statutory requirement of special reasons. The Court did not decide whether aesthetic considerations and fire safety could satisfy the special reasons condition, but observed that the proposed expansion was so massive that the claimed aesthetic and fire safety improvements were incidental in relation to the relief sought by the applicant. *Id.* at 277–78; *cf. Kessler v. Bowker,* 174 *N.J.Super.* 478, 486 (App.Div.1979) ("beautifying an area can be deemed a special reason justifying a variance to expand a nonconforming use"), certif. denied, 85 *N.J.* 99 (1980). The Court also rejected as unsubstantiated by the record the finding that the expanded facility would lessen noise from the operation of the dairy. *Id.,* 50 N.J. at 278. As to the Board's finding that the processing and distribution of milk serves the general welfare, the Court held that finding to be inadequate to sustain a commercial use variance:

We disagree that the interpretation is broad enough to encompass the present variance. The cases in this Court in which a significant factor has been the contribution of the proposed use to the "general welfare" all have involved uses which *inherently* served the public good. Of course, the processing and distribution of milk does serve the general welfare. However, this activity, unlike a school or hospital, does not in itself provide the basis for a finding of special reasons any more than does the manufacture and distribution of any other necessary commodity. In all the above cited cases the very nature of the use gave rise to special reasons for the grant of a variance, and in those cases we did not require a finding that the general welfare could be best served by locating the proposed use at the specific site in question. *Where, however, the use is not of the type which we have held of itself provides special reasons, such as a school or hospital, there must be a finding that the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought.* This is so because nearly all lawful uses of property promote, in greater or lesser degree, the general welfare. Thus, if the general social benefits of any individual use—without reference to its particular location—were to be regarded as an adequate special reason, a special reason almost always would exist for a use variance. Mere satisfaction of the negative criteria of the statute would then be all that would be required to obtain a variance under subsection (d). [*Id.* at 279–80 (emphasis added) (citations omitted).]

Observing that the record contained no proof, aside from the dairy's prior existence on the property, that the site in question was particularly suitable for the proposed expanded operation

of the dairy, the Court reversed the grant of the variance. *Id.* at 280–81. It distinguished its earlier decision in *Kramer v. Sea Girt, supra,* 45 *N.J.* 268, noting that the proofs in that case demonstrated that the hotel site was unsuitable for the permitted single-family use [9] and was particularly suitable for the proposed use. *Id.* at 282–83.

The holding in *Kohl v. Fair Lawn* was extensively discussed in *Fobe Assocs. v. Mayor of Demarest,* 74 *N.J.* 519 (1977), where we reviewed the denial by the Demarest Board of Adjustment of a use variance application to construct garden apartments in a single-family residence district. Although not critical to our decision, we observed in *Fobe* that there was neither proof in the record nor a determination by the board that the general welfare would be served because the site in question was particularly suitable for garden apartments, the standard enunciated in the *Kohl* opinion. *Id.* at 534–35. We declined to decide whether or not the provision of multi-family housing inherently served the general welfare in view of our determination to sustain the board of adjustment's finding that

---

[9]Although the Court in *Kohl* did not expressly acknowledge that proof of undue hardship—*i.e.,* that the property is not reasonably adapted to a conforming use, *Brandon v. Montclair, supra,* 124 *N.J.L.* at 149—would also satisfy the requirement of special reasons, we deem it self-evident that that ground for a use variance has been preserved. As noted, prior to the 1948 amendments to the Municipal Land Use Law, undue hardship was the only circumstance considered sufficient to support a use variance, *supra* at 9–10. In several cases subsequent to the 1948 amendments, undue hardship in the form of economic inutility has been acknowledged to constitute a special reason to support a use variance. *See Kramer v. Sea Girt, supra,* 45 *N.J.* at 286–87; *Dolan v. DeCapua,* 16 *N.J.* 599, 609 (1954); *Monmouth Lumber Co. v. Ocean Township, supra,* 9 *N.J.* at 77; *Yahnel v. Jamesburg, supra,* 79 *N.J.Super.* at 518–19. Accordingly, we disagree with the observations in *Henningsen v. Township of Randolph,* 214 *N.J.Super.* 82, 88 (App.Div.1986), rev'd, 108 *N.J.* 175 (1987), and *New Hope Baptist Church v. Sommerhalter,* 214 *N.J.Super.* 363, 367 (App.Div. 1986), that economic inutility cannot constitute a special reason to support a use variance. Concurrently with the filing of this opinion, we have summarily reversed the Appellate Division's decision in *Henningsen* and have remanded the case to that court for reconsideration.

the applicant's proofs did not satisfy the statutory negative criteria. *Id.* at 537–39.

■ We take this opportunity to reaffirm the principles set forth in Justice Proctor's opinion in *Kohl v. Fair Lawn, supra,* 50 *N.J.* 268. A use-variance application for a commercial use not permitted by the zoning ordinance must satisfy the statutory special-reasons standard. That standard has generally been defined in relation to the purposes of zoning, *see N.J.S.A.* 40:55D–2, and our decisions have emphasized the promotion of the general welfare as the zoning purpose that most clearly amplifies the meaning of special reasons. *See Andrews v. Ocean Township, supra,* 30 *N.J.* at 250. Although certain commercial uses may inherently serve the general welfare in a particular community, the typical commercial use can be better described as a convenience to its patrons than as an inherent benefit to the general welfare. For such uses, any benefit to the general welfare derives not from the use itself but from the development of a site in the community that is particularly appropriate for that very enterprise. As Justice Proctor explained in *Kohl v. Fair Lawn, supra:*

> [I]f the general social benefits of any individual use—without reference to its particular location—were to be regarded as an adequate special reason, a special reason almost always would exist for a use variance. [50 *N.J.* at 280.]

*Cf. Mocco v. Job, supra,* 56 *N.J.Super.* at 477 ("The facts relied upon present no justification for the conclusion that the particular site in this residential district must be the location for the variance here sought in order to promote the 'general welfare.' "); Cunningham, "Control of Land Use," *supra,* 14 *Rutgers L.Rev.* at 93 n. 261.

### III

In the twenty-year period since *Kohl v. Fair Lawn* was decided, the legislature has made significant changes in the statutes regulating land use. Of primary significance is the enactment of the Municipal Land Use Law, *L.*1975, *c.* 291, *N.J.S.A.* 40:55D–1 to –112, to supersede the former Municipal

Planning Act. The MLUL gives full authority to municipal boards of adjustment to grant use variances on the affirmative vote of five members. *N.J.S.A.* 40:55D–70(d). Under the prior law the board could recommend the grant of use variances to the governing body, but could not itself approve a use variance. *N.J.S.A.* 40:55–39(d) (repealed 1975). Under the MLUL, the board of adjustment's approval, but not its denial, of a use variance may be appealed to the governing body, but only if the local zoning ordinance authorizes such an appeal. *N.J.S.A.* 40:55D–17.

Also pertinent to the issues before us are the provisions of the MLUL requiring the zoning ordinance to be substantially consistent with the land use and housing elements of the master plan, *N.J.S.A.* 40:55D–62(a),[10] and the requirement that the planning board re-examine the master plan and zoning ordinance at least once every six years and report its findings and recommendations for revision. *N.J.S.A.* 40:55D–89. Failure of a municipality to conduct the required review creates a rebuttable presumption that the zoning ordinance is "no longer reasonable." *N.J.S.A.* 40:55D–89.1 (enacted *L.*1985, *c.* 516). Another recent amendment to the MLUL requires all boards of adjustment to conduct an annual review of their decisions on variances and other appeals. *N.J.S.A.* 40:55D–70.1 (enacted *L.* 1985, *c.* 516). The boards must report to the governing body and planning board on those provisions of the ordinance that were the subject of variance appeals, and offer recommendations for amendments to or revisions of the zoning ordinance. *Id.*

The specific legislative changes in our statutes regulating land use and zoning reflect significant policy decisions by the legislature concerning the proper relationship between use vari-

---

[10]The governing body may adopt a zoning ordinance inconsistent with the land use and housing elements of the master plan but must do so by the affirmative vote of a majority of its authorized membership and must set forth in a resolution its reasons for so acting. *N.J.S.A.* 40:55D–62.

ances and zoning ordinances. The power to grant use variances has been shifted from the governing body, whose responsibilities include enactment of the zoning ordinance, to the board of adjustment. This shift of authority undoubtedly reflects the legislature's determination that boards of adjustment possess special competence to decide use-variance applications, and that absent an appeal no participation by the governing body is necessary. However, delegation of the authority to grant use variances to boards of adjustment increases the likelihood that such variances may conflict with the intent of the master plan and zoning ordinance to a greater extent than was the case when the power to grant them was vested in the governing body. Tension between use variances and the zoning ordinance and master plan is less likely in those municipalities that authorize appeals from the grant of use variances to the governing body. *N.J.S.A.* 40:55D–17(a).

The legislative enactments requiring periodic re-evaluation of municipal master plans and zoning ordinances, *N.J.S.A.* 40:55D–89, –89.1, and annual reports and recommendations from the boards of adjustment, *N.J.S.A.* 40:55D–70.1, reflect a legislative policy intended to insure that a municipality's master plan and zoning ordinance reflect contemporary needs and conditions, and that the governing body is kept informed of provisions of the zoning ordinance that generate variance requests. Thus, the mandatory re-examination by the planning board of the master plan and zoning ordinance, at least every six years, is intended to inform the governing body of the need for revisions in the plan and ordinance based on significant changes in the community since the last such re-examination. Similarly, the annual reports by boards of adjustment summarizing variance requests throughout the year and recommending amendments to the zoning ordinance are designed to avoid successive appeals for the same types of variance by encouraging the governing body to amend the ordinance so that such appeals will be unnecessary. When an informed governing body does not

change the ordinance, a board of adjustment may reasonably infer that its inaction was deliberate.

Our role is to give effect to these legislative policies. In the use-variance context, we believe this can best be achieved by requiring, in addition to proof of special reasons, an enhanced quality of proof and clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance. The applicant's proofs and the board's findings that the variance will not "substantially impair the intent and purpose of the zone plan and zoning ordinance," *N.J.S.A.* 40:55D–70(d), must reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district. For example, proof that the character of a community has changed substantially since the adoption of the master plan and zoning ordinance may demonstrate that a variance for a use omitted from the ordinance is not incompatible with the intent and purpose of the governing body when the ordinance was passed.[11] Reconciliation on this basis becomes increasingly difficult when the governing body has been made

---

[11]The nature of the proofs offered to achieve reconciliation of the proposed variance with the zoning ordinance will depend on the circumstances of each case. It may be that the proposed use was one, like a health club, that was uncommon when the ordinance was last revised, but has since gained currency. Competent proofs to this effect could dispel the concern that exclusion of the use was deliberate rather than inadvertent. Likewise, a variance application to permit a commercial use to be established on residentially-zoned property might also be supported by proofs demonstrating substantial changes in the character of the neighborhood surrounding the subject property since the adoption of the ordinance, in order to reconcile the apparent conflict between the ordinance and the proposed variance. Similarly, the needs and character of an entire community may be altered by extrinsic factors, such as the proximity of major highway construction or commercial development in adjoining municipalities. Such circumstances may create a demand for uses, such as hotels, that were not anticipated when the ordinance was last revised. These examples are offered merely to illustrate, and not to exhaust, the nature of the proofs that could be offered to reconcile a proposed use variance with the provisions of the zoning ordinance.

aware of prior applications for the same use variance but has declined to revise the zoning ordinance.

This requirement of enhanced proof and specific findings regarding the negative criteria is markedly consistent with the legislative policies underlying the statutory changes in land use law since *Kohl v. Fair Lawn, supra,* 50 *N.J.* 268. It is also consistent with this Court's conclusion in *Ward v. Scott,* that the newly-enacted special-reasons standard for use variances was not unconstitutionally vague because of the

specific safeguards to insure against unwarranted or arbitrary action and untrammeled administrative discretion. * * * Above all, there is the fixed and far reaching protective restriction in the concluding provision of *R.S.* 40:55–39 against allowance of the variance unless it can be granted "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." [11 *N.J.* at 126.]

However, as is evident from the perfunctory proof and conclusory findings in this record, the negative criteria often do not function as the "fixed and far reaching protective restriction" envisioned by the Court in *Ward v. Scott, supra,* 11 *N.J.* 117. Typically, expert testimony designed to satisfy the negative criteria will, as in this case, be expressed as an incantation of the statutory phrase. The added requirement that boards of adjustment must reconcile a proposed use variance with the provisions of the master plan and zoning ordinance will reinforce the conviction expressed in *Ward v. Scott,* that the negative criteria constitute an essential "safeguard" to prevent the improper exercise of the variance power.[12] In imposing this

---

[12]We intend no change in the proof required to satisfy the first prong of the negative criteria, that the variance can be granted "without substantial detriment to the public good." In this respect the statutory focus is on the variance's effect on the surrounding properties. The board of adjustment must evaluate the impact of the proposed use variance upon the adjacent properties and determine whether or not it will cause such damage to the character of the neighborhood as to constitute "substantial detriment to the public good." *See Yahnel v. Jamesburg, supra,* 79 *N.J.Super.* at 519:

The key word here is "substantially." It comes from the statute itself. Obviously, any permission for a nonresidential use in a residential zone may have some tendency to impair residential character, utility or value.

requirement, we anticipate that its application will not substantially limit the vitality and flexibility of use variances to afford appropriate relief from the general provisions of a zoning ordinance. Nor do we signify a departure from the view we expressed in *Kramer v. Board of Adjustment, Sea Girt, supra,* that boards of adjustment "because of their peculiar knowledge of local conditions must be allowed wide latitude in the exercise of delegated discretion." 45 *N.J.* at 296. We fully adhere to that view. Our purpose is simply to insure that the exercise of discretion by boards of adjustment faithfully reflects the statutory standards ordained by the legislature.

We also emphasize, for the guidance of boards of adjustment and their counsel, that in the event a use variance is challenged, a conclusory resolution that merely recites the statutory language will be vulnerable to the contention that the negative criteria have not been adequately established. The board's resolution should contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the master plan and zoning ordinance, and determined that the governing body's prohibition of the proposed use is not incompatible with a grant of the variance. If the board cannot reach such a conclusion, it should deny the variance. To the extent this requirement narrows the discretion of boards of adjustment to grant use variances for uses intentionally and persistently excluded from the zoning ordinance by the governing body, we believe it accurately reflects the strong legislative policy favoring zoning by ordinance rather than by variance.

---

But the statutory rationale of the function of the board of adjustment is that its determinations that there are special reasons for a grant of variance and no substantial detriment to the public good or impairment of the zone plan, etc., in such grant represent a discretionary weighing function by the board wherein the zoning benefits from the variance are balanced against the zoning harms. If on adequate proofs the board without arbitrariness concludes that the harms, if any, are not substantial, and impliedly determines that the benefits preponderate, the variance stands.

■ In view of the significant change in the law represented by our holding, the effect and application of our decision, except as to this case, shall be prospective only. *Merenoff v. Merenoff,* 76 *N.J.* 535, 560 (1978).

## IV

■ Applying these principles to the facts of this case, we decline to sustain the variance in view of the inadequacy both of the present record and the findings of the board of adjustment. We disagree with the conclusion of the board that "the need for good motel accommodations" constitutes a special reason sufficient to sustain this variance. The testimony in the record fell far short of demonstrating that the existing hotel and motel room capacity in the vicinity was so inadequate that the provision of additional rooms would benefit the general welfare in a manner comparable to the benefit established by institutional-type uses. *Supra* at 11–13.

Accordingly, the applicant was required to prove, and the board was required to find, that the subject property was particularly suitable for the proposed use. *Kohl v. Fair Lawn, supra,* 50 *N.J.* at 279–80. The board of adjustment made no such finding [13] and, in our view, the proofs in the record were inadequate to support such a finding. The fact that the site is near an interstate highway does not distinguish it from any other property in the vicinity of the highway. We cannot conclude from the record before us whether the applicant could

---

[13]In the course of oral argument before the Law Division, counsel for the Board of Adjustment stated that the Board took into consideration the "uniqueness * * * with regard to this particular piece of property." He observed that it was his responsibility that this finding was omitted from the Board's resolution, observing that such resolutions, "all too frequently * * * [are] done in a very superficial manner." Despite our conclusion that the record in this case would not have supported a finding that the property was particularly suitable for the proposed use, we emphasize that members of boards of adjustment, as well as their counsel, should review variance resolutions with care in order to verify that they adequately set forth the findings and conclusions required to sustain the board's action.

sustain the burden of proving the existence of special reasons for the proposed variance. We do conclude that, on this record, the applicant has not sustained its burden of proof.

Moreover, the conclusory recitation in the board's resolution of approval that "the applicant has demonstrated that the relief requested can be granted without substantial detriment to the intent and purpose of the Zoning Ordinance" does not constitute the deliberative and specific determination we now require to satisfy the negative criteria. In view of the three prior motel variance applications, all of which were granted by the local board of adjustment, it is inconceivable that the governing body was unaware that motel construction, prohibited by the zoning ordinance, was proceeding in the municipality.[14] Nevertheless, the governing body took no action to amend the zoning ordinance in order to authorize motel construction in any zoning district.[15]

In this context, the applicant had the formidable burden of proving that the grant of another use variance for a motel at this site was not inconsistent with the intent and purpose of the

----

[14]As noted, in this case the governing body reviewed the decision of the Board of Adjustment pursuant to *N.J.S.A.* 40:55D–17(a) and affirmed the grant of the variance. *Supra* at 8.

[15]Zoning decisions for certain uses may be complicated by a governing body's reluctance either to designate specific sites on which the use is permitted or to allow the use generally within a zoning district. One option available to the governing body pursuant to the Municipal Land Use Law is the authorization to provide in the zoning ordinance for conditional uses to be granted by the planning board "according to definite specifications and standards which shall be clearly set forth with sufficient certainty and definiteness * * *." *N.J.S.A.* 40:55D–67(a). Conditional uses are so classified because they have characteristics that make them unsuitable for indiscriminate location within the zoning district. *PRB Enterprises, Inc. v. South Brunswick Planning Bd.*, 105 *N.J.* 1, 8 (1987). However, a governing body's failure to zone for a use in a zoning district either generally or conditionally should not necessarily preclude the grant of variance relief for a unique site in the municipality particularly suited for the use, if the applicant can satisfactorily reconcile the variance with the governing body's inaction.

zoning ordinance as reflected by the governing body's failure to authorize motels as a permitted use in the zone. No such proof was offered. No such finding was made, or could have been made, by the Board of Adjustment.

Because both the record and the Board of Adjustment's resolution are inadequate to sustain the variance, we reverse the judgment of the Appellate Division. We remand the matter to the Board of Adjustment to permit the applicant, if it desires, to attempt to supplement the record before the Board, and to permit the Board to adopt new findings and conclusions not inconsistent with this opinion. We do not retain jurisdiction.

*For reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.