**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4405-15T4

ROBINSON HOLLOWAY,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

THE ZONING BOARD OF
ADJUSTMENT OF THE CITY
OF JERSEY CITY,

    Defendant-Respondent,

and

BGT ENTERPRISES, LLC,

    Defendant-Respondent/
    Cross-Appellant.

_____

        Argued September 26, 2018 – Decided October 30, 2019

        Before Judges Nugent and Mawla.

        On appeal from the Superior Court of New Jersey, Law
        Division, Hudson County, Docket No. L-3862-15.

Cynthia Amelia Hadjiyannis argued the cause for appellant/cross-respondent.

Vincent J. La Paglia argued the cause for respondent.

Ira E. Weiner argued the cause for respondent/cross-appellant (Beattie Padovano, LLC, attorneys; Ira E. Weiner, of counsel and on the briefs; Mariya Gonor, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

Plaintiff, Robinson Holloway, appeals from a Law Division order that dismissed with prejudice her complaint in lieu of prerogative writs, in which she challenged defendant Zoning Board of Adjustment of the City of Jersey City's (Board) grant of a development application to defendant BGT Enterprises, LLC (BGT). BGT cross-appeals from an earlier Law Division order that denied its motion to dismiss plaintiff's prerogative writs action as untimely. For the reasons that follow, we affirm the trial court's dismissal of plaintiff's prerogative writs action. We dismiss the cross-appeal as moot.

I.

In February 2015, BGT filed a general development application for preliminary and final major site plan approval with the Board. Following a hearing in June of the same year, the Board approved the application by a five

to two vote. The Board memorialized its decision in a resolution it adopted on July 23, 2015.

On September 14, 2015, plaintiff filed a complaint in lieu of prerogative writs in which she challenged the Board's approval of BGT's development application. BGT filed a motion to dismiss the complaint as untimely. The court denied the motion. Following further proceedings, the trial court determined the Board had not acted arbitrarily, capriciously, or unreasonably, and therefore dismissed the complaint with prejudice. These appeals followed.

BGT presented the testimony of five witnesses during the hearing on its development application. The Board's Planner also testified. Although numerous members of the public spoke following BGT's presentation, no one presented any witnesses to refute the testimony and opinions of BGT's experts. BGT presented the following evidence.

The subject of BGT'S development application is designated on the City of Jersey City Tax Map as Block 9901, Lots 7, 8, 9 and 10 (the Property). Located on the northwest corner of the intersection of Newark Avenue and Brunswick Street, in the Neighborhood Commercial (NC) zoning district, the vacant, oddly shaped property, consisting of 9,019 square feet, was once used as a service station, a use no longer permitted. The NC Zone permits, among

other uses, retail sales on the ground floor and residential apartments above the first floor. The property has 110 feet of frontage along Brunswick Street and 166 feet of frontage along Newark Avenue. Under the applicable zoning ordinance definition, Brunswick Street is the front property line and Newark Avenue a side property line.

The purpose of the NC zoning district, according to the applicable ordinance, "is to recognize the existence and importance of neighborhood business districts and promote continued efforts to strengthen and revitalize them through public-private partnerships." The section describing commercial building height consists of two subparts. The first limits buildings to "[f]our stories from grade where on-site parking is not required. (See Parking standards for NC uses); five stories from grade where on-site parking is required regardless of whether parking level is below, at, or above grade." The second sub-section provides that "[m]inimum floor to ceiling height shall be nine feet for all floors except those devoted to parking; maximum floor to ceiling height for residential floors shall be twelve . . . feet."

BGT proposed to develop the Property with a seven-story mixed-use building consisting of six stories for fifty residential dwelling units over a ground floor containing 4,895 square feet of commercial space. The proposed

4

development also included a residential lobby, bicycle parking for thirty bicycles, and parking for three "Zipcars." A roof deck and an amenity room were also proposed on the building's roof for the use of its occupants. To build its project, BGT required a height variance as well as variances for rear yard setback, parking, and commercial signage.

BGT presented the following witnesses to establish that it met the criteria for the required variances. William J. Groeling, a licensed site remediation professional, explained that his company's environmental investigation revealed that two underground storage tanks, a 550-gallon heating oil tank and a 550-gallon waste oil tank, remained under the Property's surface and had to be removed. Excessive amounts of benzene, lead, and tetrachloroethylene contaminated the subsurface soil and groundwater. To remediate the site, BGT proposed to remove approximately 350 tons of contaminated soil, replace it with certified uncontaminated soil, and monitor the groundwater. According to Groeling, the groundwater would likely clean itself up once the contamination from the soil was removed. In his opinion, the soil was the source of contamination of the groundwater.

In addition, BGT proposed to include a vapor barrier. Groeling estimated that the cost of remediation was between $200,000 and $250,000, at minimum.

The final cost could increase because no one could predict the cost with certainty until the excavation and remedial work commenced.

Rodney Simon, who conducted a geotechnical investigation, including soil borings to approximately ninety feet, explained that the soil conditions were so poor "that a deep-foundation system [was] necessary. Piles [were] necessary on the property." Simon explained the technical aspects of the soil and his investigation, including why the soil conditions would not permit a typical "shallow foundation type," consisting of reinforced concrete footings bearing directly on the ground with a minimum amount of steel reinforcement. Because a "deep" foundation would be required, the cost of the foundation for the proposed project would be significantly greater than a project built on a "shallow" foundation.

BGT's "expert in architecture," Anthony Vandermark, testified the anticipated foundation costs would exceed one million dollars. Vandermark also explained the architectural aesthetics of the building. He explained that the six residential floors would be constructed "at the minimum [nine] foot floor to ceiling and the commercial level [would be constructed] at [fourteen] foot floor to ceiling." He also explained there would be fifty residential units: forty-one one-bedroom units, twenty-nine of which would have "den space," and nine

6

units with either two or three bedrooms. BGT proposed 140 square feet of signage. Vandermark testified he believed the proposed signage would decrease "depending on how many actual commercial tenants are going to occupy the unit."

BGT's principal testified BGT had entered into a thirty-five year lease, twenty-five years with two five-year options, for a nearby parking lot. The leased parking would permit twenty occupants to park from 7:00 p.m. to 7:00 a.m.

BGT's final witness was Edward Kolling, an acknowledged expert in planning. Kolling explained that factors impacting the site included its highly irregular property shape, which made it difficult "in terms of laying out the building." The soil and environmental conditions added "multiple layers of hardship." In addition to the odd lot shape and environmental contamination, an adjacent building had balconies on the property line, thus creating "a zero lot line, a zero setback."

Kolling testified that the elimination of a non-conforming use, albeit abandoned, could be viewed as a benefit to the community because it advances the purposes of zoning and the intent of the current zone plan. He explained that although the service station had been vacant a long time, it was an eyesore

in the community. BGT's proposed remediation of the environmental contamination also provided a community benefit and advanced the purposes of zoning.

Next, Kolling addressed the variances. He noted the proposed uses were permitted in the NC Zone. He opined that the avoidance of a severe impact to the soft soils, remediation of environmental conditions, a design which included "a light well," and the shape of the property, all supported the height variance. Conceding the increased height also increased density and intensity of development, these factors "support[ed] the undue hardships and the extreme economic conditions that impact[ed] this property in terms of being able to develop it."

Kolling noted the added height also could be supported by the building's larger size, more than 9,000 square feet. Because the property was a corner location, it had street frontage of 110 and 160 feet, or 270 total feet of street frontage, "which allows air and light to penetrate it." Such air and light penetration would benefit not only the proposed project, but the adjacent structure as well.

Kolling noted that the building would not be unique in terms of its height. A short distance to the west, two buildings were approved "on either side of

Newark Avenue" as twelve-story buildings. Not far to the east, there existed a six-story building. Consequently, approving the variance would not result in any substantial detriment to the intent of the zone plan or to the general welfare.

Further, according to Kolling, the height of the building would be mitigated by the project being "a corner property, [and] also by the step-back of the upper floor and the way the architect has treated that in terms of materials. There are actually two-step backs on the western side of the property as it adjoins lot 11."

In summary, Kolling concluded the height variance could be granted "in terms of the extreme hardships facing this property and the fact that this property [could] accommodate the height" without substantial detriment or impact on either the general welfare or to the zone plan.

Turning to the rear yard variance, Kolling explained the rear yard runs perpendicular to Newark Avenue. In actuality, it

> serves as a side property line of lot 11. So having this property adjoin the side of the property of lot 11 would be appropriate because you would end up with a continuous streetscape and street frontage rather than gaps, which you don't have in any neighborhood-commercial districts, whether it be Newark Avenue commercial or Central Avenue or west side.

Kolling added that maintaining the streetscape was a better approach to urban design and its benefits would outweigh any detriment.

Acknowledging the zone required the project to have fifty parking spaces, Kolling noted that because of the Property's configuration and its narrowness in certain locations, it could not support parking without completely decimating the commercial ground floor. Because the purpose of the NC Zone was to encourage commercial activity and street activity, granting the parking variance would promote the purposes of zoning as well as the zone plan and would contribute to the vitality of Newark Avenue. The latter factor, in Kolling's opinion, contributed to the public good. Kolling added the benefits of granting the parking variance would outweigh any detriments.

Kolling also testified that the impact of the parking was further mitigated by the "Zipcar-like or style facility that would be provided. Those types of cars are sometimes considered to substitute for anywhere from five to seven to eight parking spaces." Kolling explained that "not having to have a car, those Zipcars are available to a larger population. And it would not only be available to residents of this building, but to the general neighborhood." Kolling considered this circumstance as additional mitigation. He opined that the additional signage sought was warranted to help support commercial activity.

The Board asked Senior Board planner Matthew Ward to explain his report on the application. The report was admitted into evidence. Ward noted the difficulties in developing the site, from its irregular dimensions to soil contamination. He asserted, however, that the requested variances would advance the purpose of the NC Zone, and promote "continued efforts to strengthen and revitalize" the area. Ward added that a variance for parking would also benefit and help restore the property.

Based on BGT's presentation, the Board granted its development application. In its memorializing resolution, the Board found the property

> particularly well suited for the type of mixed-use structure proposed and well suited to support the proposed height and stories without any substantial detrimental impacts because of the large size or the lot, its corner location and orientation along Newark Avenue, the soil conditions affecting the property, the design of the building, and the character of the area.

The Board noted that the actual height of the building was consistent with "what is permitted by the NC Zone for similar or alternative permitted uses in the NC Zone." The Board concluded the proposed development met the intent and purpose of the zone plan.

The Board found that the environmental clean-up and condition of the soils made it "impractical to construct a smaller mixed-use commercial building

11

from a practical structural perspective and results in a hardship in the development of this property." The Board determined that granting the variances and approving the project would promote the Municipal Land Use Law in five ways. First, granting the variances would guide the appropriate use and development of the property as a mixed-use building in a NC Zone, in keeping with the character of the area and by removing an unsightly vacant and non-conforming service station that had become a blight on the neighborhood. Thus, the public health and safety would be promoted through environmental remediation at the site.

Second, granting the variances would support the goal of providing adequate light and air through the provision of a 425 square foot open space on each of the upper stories, in order to accommodate the balconies constructed on the adjoining building along the common property line.

Third, granting the variances would provide sufficient space in an appropriate location for types of residential and commercial uses according to their environmental requirements.

Fourth, granting the variances would promote a desirable visual environment through removal of an unsightly, vacant service station and its replacement with an attractive mixed-use structure.

Last, granting the variances would help shape development of the land with a view of the cost of such development and provide for the most efficient use of the land.

The Board was satisfied that granting the variances would not result in any substantial detriments to the public good or general welfare. The members arrived at this conclusion because Newark Avenue is a "mixed-use commercial/residential area and the proposed building is consistent with the character of the area, and will provide a positive impact on the area." In this regard, the Board reiterated that the development would remove a vacant, abandoned service station building that was an eyesore and a blighting influence on the area. The Board also repeated the benefit of environmental "mitigation."

As to parking, the Board concluded there would be no substantial detriment because any substantial impacts would be mitigated by the provision for the Zipcars and the parking lease. Concluding that BGT satisfied both the positive and negative criteria for the variances, the Board granted BGT's development application.

II.

Plaintiff argues the Board misapplied the criteria under N.J.S.A. 40:55D-70(d)(6) when it granted the height variance based on financial hardship.

A-4405-15T4

Plaintiff notes the Board made no finding that a conforming structure could not be constructed. Instead, the Board emphasized the considerable costs BGT would be required to incur to remediate the soil contamination and build the proposed structure on a "deep" foundation. Plaintiff contends with respect to the Board's finding "that due to soil conditions construction of a conforming structure would be 'impractical[,]' . . . the word impractical should be read to mean more costly." Plaintiff adds that the evidence BGT presented to the Board, specifically its chart entitled "Stories vs. Foundation Cost Comparison," establishes "that a conforming [five]-story building can be constructed, but that it would not be as profitable as a [seven]-story building."

In addition, plaintiff argues that when a developer is aware of site conditions when the developer purchases land, the conditions and resulting costs cannot be considered a hardship. In short, plaintiff argues that a conforming structure could have been built and been profitable, albeit less profitable than a seven-story building.

Plaintiff next contends the trial court's affirmance of the Board's decision is unsupported by the record. Moreover, the Board failed to take into consideration the surrounding neighborhood and the purpose of the height restriction in the NC zoning district.

BGT responds that the Board's resolution was supported by substantial evidence in the record. In its cross-appeal, BGT argues the trial court erred when it permitted plaintiff to pursue an untimely filed complaint.

The Board, like BGT, argues that BGT satisfied the positive and negative criteria for a height variance. The Board also agrees with BGT that the trial court should have dismissed plaintiff's complaint as untimely.

In response to BGT's cross-appeal, plaintiff argues that the trial court properly determined the accrual date for her cause of action, and, alternatively, that expanding the time for filing a prerogative writs action was an appropriate exercise of discretion. BGT disputes plaintiff's arguments.

III.

The Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, provides that a board of adjustment shall have the power to:

> In particular cases for special reasons, grant a variance to allow departure from regulations pursuant to article 8 [C.40:55D-62 et seq.] of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use, (3) deviation from a specification or standard pursuant to section 54 of P.L.1975, c.291 (C.40:55D-67) pertaining solely to a conditional use, (4) an increase in the permitted floor area ratio as defined in section 3.1 of P.L.1975, c.291 (C.40:55D-4), (5) an increase in the permitted density as defined in section 3.1 of P.L.1975, c.291 (C.40:55D-4), except as

applied to the required lot area for a lot or lots for detached one or two dwelling unit buildings, which lot or lots are either an isolated undersized lot or lots resulting from a minor subdivision or (6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure. A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board, or two-thirds of the full authorized membership, in the case of a regional board, pursuant to article 10 [C.40:55D-77 et seq.] of this act.

[N.J.S.A. 40:55D-70(d).]

However,

No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

[Ibid.]

Thus, generally, an applicant for a (d) variance must show "special reasons," the statute's positive criteria, and that the variance can be granted "without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan," the statute's negative criteria. Grasso v. Borough of Spring Lake Heights, 375 N.J. Super. 41, 48-49 (App. Div. 2004) (quoting N.J.S.A. 40:55D-70(d). "The standard for establishing special

reasons depends on the type of (d) variance at issue." Id. at 49 (citing Cell S. of N.J., Inc. v. Zoning Bd. of Adjustment, 172 N.J. 75, 83 (2002)).

For a (d)(6) or height variance, an applicant can establish the positive criteria by demonstrating undue hardship, that is, "the property for which the variance is sought cannot reasonably accommodate a structure that conforms to, or only slightly exceeds, the height permitted by the ordinance. Stated differently, the applicant for a (d)(6) variance on grounds of hardship must show that the height restriction in effect prohibits utilization of the property for a conforming structure." Id. at 51. Alternatively, an applicant can demonstrate that the proposed structure's height will not offend the zoning ordinance's purpose for the height restriction and will "nonetheless be consistent with the surrounding neighborhood." Id. at 53. A zoning board must also "consider the effect of the proposed height variance on the surrounding municipalities affected by the decision." Jacoby v. Zoning Bd. of Adjustment, 442 N.J. Super. 450, 466 (App. Div. 2015).

## A.

When reviewing a zoning board's decision to grant or deny a development application, we apply the same principles as the Law Division. D. Lobi Enters., Inc. v. Planning/Zoning Bd., 408 N.J. Super. 345, 360 (App. Div. 2009)). A

"board's decisions enjoy a presumption of validity, and a court may not substitute its judgment for that of the board unless there has been a clear abuse of discretion." Price v. Himeji, LLC, 214 N.J. 263, 284 (2013) (citing Cell S. of N.J., 172 N.J. at 81). "Even if we have some doubt about the wisdom of a board's action or some part of it, we may not overturn its decision absent an abuse of discretion." D. Lobi Enters., 408 N.J. Super. at 360 (citing Medici v. BPR Co., 107 N.J. 1, 15 (1987)). That is so because such boards "are composed of local citizens who are far more familiar with the municipality's characteristics and interests and therefore uniquely equipped to resolve such controversies." First Montclair Partner, L.P. v. Herod Redevelopment I, LLC, 381 N.J. Super. 298, 302 (App. Div. 2005). Boards have "peculiar knowledge of local conditions [and] must be allowed wide latitude in their delegated discretion." Jock v. Zoning Bd. of Adjustment, 184 N.J. 562, 597 (2005).

The burden is on the party challenging a board's decision to show the decision was arbitrary, capricious, or unreasonable. Ten Stary Dom P'ship v. Mauro, 216 N.J. 16, 33 (2013). "A board acts arbitrarily, capriciously, or unreasonably if its findings of fact in support of a grant or denial of a variance are not supported by the record, [Smart SMR of N.Y., Inc. v. Bd. of Adjustment, 152 N.J. 309, 327 (1998)], or if it usurps power reserved to the municipal

governing body or another duly authorized municipal official, <u>Leimann v. Bd. of Adjustment</u>, 9 N.J. 336, 340 (1952)." <u>Ibid.</u> Moreover, we review a board's determinations of questions of law de novo. <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995).

B.

Applying the legal principles applicable to height variances and our standard of review, we conclude plaintiff has not proved the Board's decision was arbitrary, capricious, or unreasonable.

As the Board determined, though perhaps not in the precise language of relevant cases, BGT demonstrated the building's proposed increased height did not offend the purpose of the zone's height restriction. The Board found that the goal of providing adequate light and air had been satisfied by the proposed building's inclusion of 425 square feet of open space in each of the upper stories, in order to accommodate the balconies constructed on the adjoining building along the common property line. Moreover, the Board determined the proposed structure was well suited to support the proposed height and additional stories because of the large lot size, its corner location with frontage along two streets, and its orientation along Newark Avenue.

The Board also determined that the actual height of the building was consistent with heights permitted by the NC Zone for similar or alternative permitted uses. As BGT's planning expert pointed out, two development applications in the vicinity of BGT's proposed project had been approved for development of twelve-story structures.

In addition to the foregoing special reasons, which satisfied the enhanced positive criteria for a (d)(6) variance, the Board found BGT met the positive criteria for special reasons defined by the general purposes of the MLUL, codified in N.J.S.A. 40:55D-2. See Burbridge v. Twp. of Mine Hill, 117 N.J. 376, 386 (1990); Medici v. BPR Co., 107 N.J. at 18. The Board determined the project would result in the removal of the remnants of an unsightly, non-conforming service station that had become a blight to the neighborhood, as well as environmental contamination at this site, thus promoting the public health and safety. In addition, the Board determined the project would provide adequate light and air, and sufficient space in an appropriate location for residential and commercial uses. The project itself would promote a desirable visual environment not only through the removal of an unsightly, vacated service station, but also by its replacement with an attractive mixed-use

structure. Last, the Board determined the project would provide the most efficient use of the land.

Concerning the negative criteria, the Board determined the variances for the proposed structure could be granted without substantial detriment to the public good and would not substantially impair the intent and purpose of the zone plan and zoning ordinance. In that regard, the Board noted that Newark Avenue was a mixed-use, commercial and residential area, and thus BGT's proposed project was consistent with the area's character. The Board also determined the structure would provide a positive impact on the area. The NC section of the municipal zoning ordinance established the purpose of the district was "to recognize the existence and importance of neighborhood business districts and promote continued efforts to strengthen and revitalize them through public-private partnerships." The Board determined the project would serve this purpose.

Moreover, the project was consistent with the surrounding neighborhood and with the surrounding area. As BGT's planner had pointed out during his testimony, two other buildings in the vicinity were approved for twelve stories.

The Board's determination was amply supported by the record and did not usurp the zoning power reserved to the municipal governing body. Thus, the

Board's decision to approve BGT's development application was not arbitrary, capricious, or unreasonable.

Citing language in the Board's resolution that site soil conditions made construction of a conforming structure impractical, plaintiff argues the proofs BGT presented showed only that a conforming structure would be less profitable, not impractical; an inadequate reason for granting a (d)(6) variance. Plaintiff also argues the Board made no finding that the height restriction effectively prohibited utilization of the property for a non-conforming structure, an omission fatal to its grant of BGT's development application. Plaintiff contends that if a developer is aware of site conditions at the time it purchases property to develop—as BGT was here—the resulting cost cannot be considered a hardship.

In view of our determination that BGT presented evidence that satisfied the alternative criteria for a (d)(6) variance, and that the Board's determination was thus supported by the record, we need not address whether soil conditions that render construction of a building below a specified number of stories economically impractical establish the positive criteria for a (d)(6) variance, or whether BGT's proofs established such impracticality.

Plaintiff's remaining arguments—the Board failed to properly apply the standard for a (d)(6) variance to the surrounding neighborhood, the purpose of the zone's height restriction is offended, and the Board's decision is not supported by the record because it is based on a hardship—are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

In view of our disposition of plaintiff's appeal, BGT's cross-appeal is moot.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION