**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1860-17T4

KAREN KIEHN,

      Plaintiff-Appellant,

v.

JOHN MONGEY, CHRISTINE
MONGEY, and MORRISTOWN
BOARD OF ADJUSTMENT,

      Defendants-Respondents.

_____

> Submitted November 8, 2018 – Decided September 13, 2019
>
> Before Judges Nugent and Mawla.
>
> On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0781-17.
>
> Mills & Mills, attorneys for appellant (John M. Mills, III, of counsel and on the brief).
>
> Calli Law, LLC, attorneys for respondents John Mongey and Christine Mongey (Lawrence A. Calli, on the brief).

Brady & Correale LLP, attorneys for respondent Morristown Board of Adjustment (David B. Brady, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

Plaintiff, Karen Kiehn, appeals from a Law Division order that dismissed her prerogative writs action. In her prerogative writs action, she challenged the use and bulk variances and site plan approval defendant Morristown Board of Adjustment (the Board) granted to her across-the-street neighbors, John and Christine Mongey (Applicants), so they could use their existing two-family residential structure—a permitted use—as a three-family house—a non-permitted use—and add more on-site parking. On appeal, plaintiff argues, among other things, the Board imposed an unlawful condition—owner-occupancy—as a quid pro quo for granting the application, and its action was thus arbitrary, capricious, and unreasonable.

Our review of the record leads us to conclude this condition—exscinded by the trial court—was of sufficient importance to the Board that it might have chosen to deny the variance without the condition. We thus vacate the Board's resolution approving the application and remand for a new determination on the application's merits. For completeness, we address plaintiff's remaining

A-1860-17T4

arguments: the Board should not have heard the application because it was barred by the doctrine of res judicata, and the trial court erred by ruling to the contrary; and, the Applicants failed to sustain their burden of proving the positive and negative criteria necessary for the relief they requested.

I.

A.

The Applicants' property is located on a Morristown street in an RT-1 zoning district, which permits one- and two-family residences. In August 2016, Applicants filed a development application with the Board. They proposed "to retrofit and utilize the existing multifamily residential structure as a [three]-family house." In addition to a use variance authorized by N.J.S.A. 40:55D-70(d)(1), Applicants required a density variance authorized by N.J.S.A. 40:55D-70(d)(5) to permit a lot area per family of 2083 square feet instead of the zone's required 4200 square feet. Applicants also required multiple bulk variances pursuant to N.J.S.A. 40:55D-70(c) and site plan approval.

The Board heard and approved the application in February 2017, and adopted a memorializing resolution the following month. Plaintiff timely filed a prerogative writs action in which she challenged the Board's decision. Following a hearing, the Law Division judge modified the Board's resolution by

exscinding one condition—the property be owner-occupied—but otherwise upheld the Board's action and dismissed plaintiff's complaint. This appeal followed.

B.

The Board conducted a hearing on the application at a single session. Because four Board members recused themselves due to conflicts, three Planning Board members served as temporary members for the purpose of hearing the application. Thus, six members heard the application. For approval, Applicants required five votes. N.J.S.A. 40:55D-70(d).

Applicants presented a single witness, Richard Schommer, an engineer and planner. Mr. Schommer testified and demonstrated with photographs that the property's appearance looked very much like other homes in the neighborhood, including the homes on either side. He explained the home on the property was built in 1916, and though it existed as a two-family dwelling, it contained three floors with three separate living quarters, including a fire escape for the upper floor. Mr. Schommer told the Board that though "[it is] a two-family . . . it did exist at some time as a three-family." He added, "[t]he third-floor, the upper unit was, in fact, used as a separate unit not properly, not legally and that's not a justification. But in a sense it's been used that way, the

building is suited for that use as you'll see from the inside in a minute." Mr. Schommer also testified the structure was vacant for "a few years" before the Applicants purchased it. The second floor was currently occupied. The first and third floors were vacant.

The engineer described the living quarters on the floor structure. He also testified that along the street in the block where the property was situated, the eight homes on the same side of the street as the property included single-family homes, two-family homes, and one three-family home. Of the eight homes across the street, only two were single-family homes, four were two-family homes, one was a three-family home and one was a four-family home.

Mr. Schommer emphasized that the proposed use would require no change in appearance, modification to, or expansion of the existing structure. Applicants proposed to expand the driveway approximately 349 square feet and add two parking spaces, which would comply with the zoning ordinance. Applicants would also be able to obtain parking permits, if needed, for on-street parking. In addition, Applicants proposed to add a solid fence and vegetation "to provide screening for the parking spaces to the neighbor."

Noting the Board could grant a variance in particular cases and for special reasons, Mr. Schommer opined the proposal would promote the general welfare

not "necessarily from the use of the facility itself, but really from the development and use of the site that is particularly suited for this use." He explained the structure was well-suited for a three-family use because it existed with three separate floors and three separate living units, and he reiterated there would be no change to the structure. Moreover, the number of people might be no different if the use is designated as two-family or three-family, because the third floor bedrooms are not precluded under the two-family use. Consequently, the second and third floors could be used together as a single living unit with four bedrooms.

Mr. Schommer also testified the proposal provided additional housing stock to the town and promoted a desirable facial environment, as evident from the existing structure, which would not be altered. The proposal would also be consistent with one of the goals outlined in the municipality's master plan, namely, the preservation of the physical character and fabric of existing neighborhoods.

Addressing the negative criteria—relief can be granted without substantial detriment to the public good and would not substantially impair the intent of the zoning ordinance—Mr. Schommer opined that the former typically looks at impacts on neighboring properties, but there will be no impact on neighboring

A-1860-17T4

properties, so relief can be granted without substantial detriment to the public good. Concerning the latter criterion, because Applicants were not seeking to expand the structure or build something new, there would be no impairment to the intent of the zoning ordinance. To the contrary, the proposed use is "fairly consistent" with the neighborhood.

One Board member asked if the Board could make the approval contingent on the owner occupying the structure. Applicants' attorney represented to the Board Applicants intended to reside in the structure. The attorney represented: "This is their home. So a condition . . . would we be amenable to a condition of approval which says three units so as long as owner occupies one of them." The attorney added, "I think the prior ownership and maintenance goes hand [in] hand. I think that's very important, so I understand that role. And I think that makes sense here, yeah."

Six members of the public, including plaintiff, spoke. Three favored the application, and three opposed it. Those who favored it did so primarily because the Mongeys had improved the appearance of the property. One, who had rented an apartment in the house in 1998, said that with the exception of the clean-up and improvement in appearance, the structure had not changed.

The three members of the public who opposed the application stressed the need to maintain the character of the neighborhood and not increase density. They expressed disbelief at the argument that a previous owner's illegal conversion of the structure from a two-family to a three-family residence should be ratified. They emphasized the significant potential problem with on-street parking and they disputed that the public interest would be served in any way by a use variance.

Plaintiff, a realtor, has been acquainted with the neighborhood where the property is located for thirty years. She explained that two of the neighborhood homes once used as two-family homes were now single-family homes. Thus, though one neighboring home "has at least five cars on the street at all times," on-street parking in the block is "just about right." Plaintiff informed the Board the tenants Applicants were renting to currently had three cars.

Plaintiff asked whether the Board could hear the application when "back in the 70's" the Board had rejected an application for the identical use. The Board's attorney replied that a similar application could be brought again because "this many years later . . . the circumstances will be different. Undoubtedly, the zoning is different. . . . The type of timeframe you're talking

about and the changes in facts and probably the legal standards that apply, you can certainly apply again."

During the Board's discussion of the application, five of the six members commented on the importance of the condition the house be owner-occupied. The first member to speak said he was "leaning towards the idea of having a requirement that it be owner[-]occupied." The Board's attorney immediately confirmed that Applicants were consenting to that condition and it would carry with the property. Another member commented on the "gorgeous" appearance of the property, then added: "And they didn't hesitate at all when I asked the key question if they would continue to make it owner[-]occupied. They didn't bail one second on that. They jumped right in and said, yeah, that's fine."

A third member expressed appreciation of the "initial suggestion on that owner[-]occupied condition." A fourth member also expressed appreciation of the condition that the house be owner-occupied, "because I think that will maintain, at least, we hope that it will maintain the property." The Chairman, who found the application to be a "difficult one," analyzed the criteria for granting the application and then explained: "The one thing that I think sways me a bit more in this situation, again, to reiterate is the owner[-]occupied element. Neglecting homes . . . often comes from owners not being present on

the property.  And it seems like that's reiterated here by several of the Board members."

The Board approved the application.  In its resolution, the Board noted "[t]he Applicant[s] offered and agreed, as a condition of approval, a requirement that the owner of the property reside in the house."  The Board found the following:

> 19.    The Applicant[s'] planner, Mr. Schommer, opined that the application satisfies the positive criteria for the use and density variances because the site is particularly well-suited to the [three]-family use and density proposed.  Permitting the property to be returned to its [three]-family status will benefit the general welfare by adding a residential unit to the Town's housing stock without any additional construction.  Additionally, the three [two]-bedroom units proposed offer a more typical residential layout than the present configuration, consisting of a [two]-bedroom unit and a [four]-bedroom unit.
>
> 20.    As demonstrated by the planner's Exhibit E, a [three]-family use on the site will be compatible with the surrounding neighborhood, where there is a mix of multi-family residential units.  Permitting a [three]-family use on the subject property is particularly appropriate because there is sufficient space on the lot to accommodate all required on-site parking for the [three]-family use, under both the Town's Ordinance requirements and the RSIS.
>
> 21.    With the availability of on-site parking and the absence of physical alteration to the exterior of the structure, there will be little or no negative impact on

the public welfare. Approval of the Applicant[s'] proposal will also satisfy a Master Plan goal of preserving neighborhood character.

22. The Board is persuaded by the planner's testimony as to the Applicant[s'] satisfaction of the positive and negative criteria for the d(1) and d(5) variances. The Board also finds that the Applicant[s are] entitled to the requested dimensional variances under both the c(1) and c(2) criteria. By reason of the size of the lot and the existing improvements thereon, compliance with the dimensional criteria cannot be obtained. The Board finds that the Applicant[s'] proposal to accommodate needed parking on site is appropriate, with the benefits derived therefrom outweighing the detriment associated with a minor increase in the existing deviation.

The resolution stated "[t]he property shall remain owner[-]occupied."

C.

The Law Division judge who dismissed plaintiff's prerogative writs action upheld the Board's exercise of discretion in hearing the application, notwithstanding a similar application had been filed years earlier. The judge rejected plaintiff's argument that the Board had relied on the engineer's net opinion in determining that Applicants had satisfied the criteria for the required variances. The judge agreed with plaintiff that the Board imposed an unlawful condition of owner-occupancy in granting the application. Having determined

11

the condition was unlawful, the judge struck it, but found the grant of approval otherwise justified and dismissed plaintiff's action.  She filed this appeal.

## II.

## A.

We begin our analysis of the parties' contentions with certain basic zoning principles.  The Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, grants zoning boards of adjustment the authority to grant use variances.  N.J.S.A. 40:55D-70(d).  The statute states:

> The board of adjustment shall have the power to:
>
> . . . .
>
> d.  In particular cases for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use, (3) deviation from a specification or standard . . . (4) an increase in the permitted floor area ratio . . . (5) an increase in the permitted density . . . .
>
> No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

[N.J.S.A. 40:55D-70(d).]

The grant of a use variance under this section requires proof of both "positive and negative criteria." Sica v. Bd. of Adjustment, 127 N.J. 152, 156 (1992).

An applicant's proof of "positive criteria" requires a showing that special reasons exist to grant the use variance. See N.J.S.A. 40:55D-70(d). These "special reasons" are defined by the general purposes of the zoning laws, codified in N.J.S.A. 40:55D-2. Burbridge v. Twp. of Mine Hill, 117 N.J. 376, 386 (1990); see also Medici v. BPR Co., 107 N.J. 1, 10 (1987). The asserted positive criteria must be site-specific, in that the applicant must show that the proposed use is "peculiarly fitted to the particular location for which the variance is sought." Kohl v. Mayor of Fair Lawn, 50 N.J. 268, 279 (1967).

The "negative criteria" requirement of subsection d incorporates two distinct but related forms of proof. First, an applicant must show that the non-conforming use of the property will not cause "substantial detriment to the public good." N.J.S.A. 40:55D-70(d). The focus of this criterion is also site-specific. It requires an assessment of the proposed variance's impact on surrounding properties and whether it will cause "damage to the character of the neighborhood." Medici, 107 N.J. at 22 n.12.

Second, an applicant must show that the proposed non-conforming use "will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70(d). To carry this burden, applicants must offer "an enhanced quality of proof . . . that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Medici, 107 N.J. at 21. Such "enhanced proof" must "reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district." Ibid.

When reviewing a zoning board's decision to grant or deny a development application, we apply the same standard as the Law Division. D. Lobi Enters., Inc. v. Planning/Zoning Bd., 408 N.J. Super. 345, 360 (App. Div. 2009). Our review is deferential. Price v Himeji, LLC, 214 N.J. 263, 285 (2013). That is so because such boards "are composed of local citizens who are far more familiar with the municipality's characteristics and interests and therefore uniquely equipped to resolve such controversies." First Montclair Partner, L.P. v. Herod Redevelopment I, LLC, 381 N.J. Super. 298, 302 (App. Div. 2005). Boards have "peculiar knowledge of local conditions [and] must be allowed wide latitude in their delegated discretion." Jock v. Zoning Bd. of Adjustment, 184 N.J. 562, 597 (2005).

A "board's decisions enjoy a presumption of validity, and a court may not substitute its judgment for that of the board unless there has been a clear abuse of discretion." Price, 214 N.J. at 284 (citing Cell S. of N.J., Inc. v. Zoning Bd. of Adjustment, 172 N.J. 75, 81 (2002)). "Even if we have some doubt about the wisdom of a board's action or some part of it, we may not overturn its decision absent an abuse of discretion." D. Lobi Enters., 408 N.J. Super. at 360 (citing Medici, 107 N.J. at 15).

The burden is on the party challenging a board's decision to show the decision was "arbitrary, capricious, or unreasonable." Kramer v. Bd. of Adjustment, 45 N.J. 268, 296 (1965). "A board acts arbitrarily, capriciously, or unreasonably if its findings of fact in support of a grant or denial of a variance are not supported by the record, [Smart SMR of N.Y., Inc. v. Bd. of Adjustment, 152 N.J. 309, 327 (1998)], or if it usurps power reserved to the municipal governing body or another duly authorized municipal official, Leimann v. Bd. of Adjustment, 9 N.J. 336, 340 (1952)." Ten Stary Dom P'ship v. Mauro, 216 N.J. 16, 33 (2013).

That said, a zoning board "'may not, in the guise of a variance proceeding, usurp the legislative power reserved to the governing body of the municipality to amend or revise the [zoning] plan. . . .'" Price, 214 N.J. at 285 (quoting Feiler

v. Bd. of Adjustment, 240 N.J. Super. 250, 255 (App. Div. 1990)). "This is of particular concern when a zoning board considers a use variance because, 'as the term implies, [it] permits a use of land that is otherwise prohibited by the zoning ordinance.'" Ibid. (quoting Nuckel v. Planning Bd., 208 N.J. 95, 101 (2011)).

Moreover, a board's determinations of questions of law are not entitled to deference by an appellate court. We review questions of law de novo. See, e.g., Fallone Props., LLC v. Planning Bd., 369 N.J. Super. 552, 561 (App. Div. 2004); Grancagnola v. Planning Bd., 221 N.J. Super. 71, 75 n.5 (App. Div. 1987).

B.

With these principles in mind, we turn to plaintiff's argument that the Board's action in granting the use variance was arbitrary, capricious, and unreasonable because it imposed an unlawful condition—owner-occupancy—as a quid pro quo for the variance. When evaluating a challenge to conditions on land use approvals, the court must address two issues: first, whether the condition is valid; second, if the condition is not valid, the consequence concerning the underlying approval. Gayatriji v. Borough of Seaside Heights, 372 N.J. Super. 203, 210 (Law Div. 2004).

None of the parties challenge the trial court's determination that the owner-occupancy condition of the use variance was unlawful. Indeed, it is "a

fundamental principle of zoning that a zoning board is charged with the regulation of land use and not with the person who owns or occupies the land." DeFelice v. Zoning Bd. of Adjustment, 216 N.J. Super. 377, 381 (App. Div. 1987) (citing 1 Rathkopf, The Law of Zoning & Planning, § 1.04 (Clark Boardman 4th ed. 1975)). Thus, "[a] variance is not personal to the property owner, but runs with the land." Ibid. (citing Garrett v. Richfield, 344 N.E.2d 154, 155 (Ohio Ct. App. 1973)). For that reason, "conditions which make a variance personal to the property owner are invalid." Id. at 382; accord Orloski v. Planning Bd., 226 N.J. Super. 666, 672 (Law Div. 1988) ("The conditions imposed must be directly related to and incidental to the proposed use of the land, and must be without regard to the person who owns or occupies it.") (quoting 3 Rathkopf, The Law of Zoning & Planning, § 40.02 (4th ed. 1987)).

The more difficult question is the effect of the unlawful condition on the underlying variance. If there is substantial doubt that the Board of Adjustment would have granted the variance absent the condition, it is appropriate to remand the matter to the Board to re-determine whether the application should be granted absent the condition. See Houdaille Constr. Materials, Inc. v. Bd. of Adjustment, 92 N.J. Super. 293, 304 (App. Div. 1966); accord Cox & Koenig, N.J. Zoning & Land Use Administration, § 19-6.3 at 423 ("Where the condition

is invalid but was of sufficient importance to the Board that the Board might choose to deny the application without the condition, and might have legitimate grounds for denial, there may be a remand to the Board after excision for a new determination on the merits of the application.").

Here, the record of the discussion among the Board members raises substantial doubt as to whether the Board would have granted the application absent the condition. Five votes were required to grant the variance. Five of the six members noted the importance of the condition. One member characterized the owner-occupancy condition as the "key question," and the Chairman's comments suggest that for him the condition was the persuading factor.

Moreover, as one member noted, the variance flew in the face of Morristown's Master Plan. As the Board's Planner explained in his report to the Board:

> The existence of [the use of several neighborhood properties with more than two dwelling units] can be explained by the fact that the RT-1 and RT-2 were previously a consolidated RT district and therefore this neighborhood previously permitted up to four family dwellings. The 2003 Morristown Master Plan recommended separating the RT district into RT-1 and RT-2 districts. The change was introduced into the Land Use Regulations by the Governing Body on September 11, 2007. After the 2007 Land Use

18

Regulations amendment, this neighborhood was permitted a maximum of two dwelling units per property.

According to the section of the Master Plan Study included in the appellate record,

> After careful consideration the decision was made to split the RT zone into two zones—The RT-1 and RT-2. The RT-2 will allow one to four family structures, just as the RT zone currently does. The RT-1 zone will only allow one and two family structures. The purpose behind this decision is to prevent further congestion in these areas, better protect the adjoining single-family residential neighborhoods and to allow for some redevelopment at an appropriate scale. It was also decided that the RT-1 zone should contain a grandfather provision that will allow existing three and four family structures to be modified and upgraded without the need for a use variance.

In view of the documented importance of the owner-occupancy condition to five Board Members and the variance grant's facial undermining of one of the Master Plan's policy underpinnings, there is substantial doubt as to whether the Board would have approved the use variance absent the condition. Accordingly, we vacate the Board's resolution approving the application and remand the matter to the Board to determine whether the application should be granted without the condition. The Board should consider any additional arguments the Applicants, plaintiff, or any other party wishes to present.

III.

For completeness, and to ensure proper appellate review in the event of a future appeal, we add the following brief comments concerning plaintiff's remaining arguments.

A.

Plaintiff asserts the application is barred by the doctrine res judicata. "As a general rule, an adjudicative decision of an administrative agency 'should be accorded the same finality that is accorded the judgment of a court.'" Bressman v. Gash, 131 N.J. 517, 526 (1993) (quoting Restatement (Second) of Judgments § 83 cmt. b (Am. Law Inst. 1982)). "Whether an application is to be rejected on the grounds of res judicata is in the first instance for the board to determine." Mazza v. Bd. of Adjustment, 83 N.J. Super. 494, 496 (App. Div. 1964). We will uphold the board's exercise of discretion in making its determination unless its action is arbitrary, capricious, or unreasonable. Ibid.; accord Bressman, 131 N.J. at 520.

Here, in response to the directive on their application, "If there were any previous Board applications for the subject property, please give the date, Board, type of application and decision of the Board," Applicants responded, "None known to Applicant." None of the Board members mentioned the previous

application, so perhaps they were unaware of it. The only discussion concerning the previous application occurred when plaintiff asked during the public session whether the Board could hear the application, given the previous denial of a nearly identical application "in the 70's." As noted, the Board's attorney replied that a similar application could be brought "this many years later because the circumstances will be different. Undoubtedly, the zoning is different. . . . The type of timeframe that you're talking about and the changes in facts and probably the legal standards that apply, you can certainly apply again."

We assume the Board did not address the issue because of the non-disclosure on the application and because the issue was never squarely raised, but rather posed in passing as a question during the public session. The issue has now been raised. The Board should address it after reviewing its previous decisions, which are included in the appellate record, but may not have been available during the Board's hearing on the application. Although the Board attorney's response may have been accurate, we are unable to discern from the record whether it is factually accurate or legally sound. Even if both, the decision should be made by the Board, not by the attorney.

A-1860-17T4

B.

Plaintiff argues the Board acted arbitrarily by erroneously considering zoning in a Historic district, though Applicants' property is not in any Historic district, and by relying on the "net opinion" of the Applicants' expert. The record does not support plaintiff's argument that the Board relied on permitted uses in the Historic district when deciding the application before it. Most of the references to the Historic district came from Applicants' attorney, not from the Board members.

Plaintiff's argument concerning Applicants' expert is not entirely without merit. For example, the expert noted Applicants' home had once been used— albeit unlawfully—as a three-family home. Nothing in the record reveals the source of the expert's knowledge, and nothing in the record establishes when or how long the situation occurred. In the absence of any reliable information concerning the topic, it is difficult to discern how the alleged previous unlawful use can be a factor in considering the current suitability of the site for the variance.

Similarly, plaintiff's criticism of the Board's finding that granting the variance will create a desirable visual environment is not entirely without merit

A-1860-17T4

considering that neither the structure nor the appearance of the house was going to change.

A board's decision that an applicant did or did not satisfy the statutory criteria for a use variance must be based on the evidence presented at the hearing, including the sworn testimony of witnesses. See Kramer, 45 N.J. at 280. Thus, the arguments of an applicant's attorney are not competent evidence from which a board may base a decision.

We perceive that some of the issues plaintiff raises could have been avoided by the development of a slightly better record, a matter that can easily be remedied during the rehearing.

Reversed and remanded for further proceedings before the Board consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1860-17T4