**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0899-22

ATLANTIC PIER CO., INC.,

    Plaintiff-Respondent,

v.

BOROUGH OF BAY HEAD
PLANNING BOARD,

    Defendant-Appellant.

_____

Argued January 22, 2024 – Decided July 2, 2024

Before Judges Sabatino, Marczyk, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2918-21.

Barry A. Stieber argued the cause for appellant (Citta, Holzapfel & Zabarsky, attorneys; Barry A. Stieber, on the briefs).

Donna M. Jennings argued the cause for respondent (Wilentz, Goldman & Spitzer PA, attorneys; Donna M. Jennings, of counsel and on the brief; Jennie M. Miller, on the brief).

PER CURIAM

Defendant Borough of Bay Head Planning Board ("Board") appeals from the October 11, 2022 trial court order reversing the Board's denial of plaintiff Atlantic Pier Co., Inc.'s 2020 application for amended preliminary and final major site plan approval, along with use and bulk variance relief, for their property located at Bridge and Lake Avenues in Bay Head. Based on our review of the record and the applicable legal principles, we affirm in part, vacate in part, and remand for further proceedings.

## I.

Plaintiff owns property located at Bridge and Lake Avenues in Bay Head, currently identified as Block 25, Lot 5.01. The property consists of approximately .728 acres, or 31,697 square feet, located in the Borough's General Business Zone District ("B-1 Zone"). The property is irregularly shaped and has eleven sides, as well as frontages on two streets, Bridge and Lake Avenues, and frontages on two waterways, Scow Ditch and Twilight Lake. The property is approximately six times larger than the minimum lot size of 5,000 square feet in the B-1 Zone.

In April 2020, plaintiff filed an application with the Board for amended preliminary and final major site plan approval to construct a three-story mixed-use building on the property requiring certain variances ("2020 Application").

2

By the time plaintiff filed its 2020 Application, the property was already partially developed with two existing mixed-use structures fronting Bridge Avenue and a more recent two-family residential duplex fronting Lake Avenue with the center of the property yet to be developed, although plaintiff had previously received approval for certain aspects of the project. Before addressing the 2020 Application and 2021 amendment, we must address the prior development applications and approvals involving plaintiff's property to provide context for the court's decision.

In June 2015, the Board granted plaintiff preliminary and final major site plan approval, use variances, and several bulk variances to demolish existing commercial structures and two second-floor apartments located on the property, and to construct seven new retail buildings and a residential duplex with related site improvements ("2015 Approval"). In approving the application, the Board determined the purposes of the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-2, would be advanced, that the benefits substantially outweighed any detriment, that special reasons existed to grant the variances requested, and that the variances could be granted without substantial detriment to the public good and without substantial impairment to the intent and purpose of the Borough's Master Plan or Zoning Ordinance.

3

In the 2015 Approval, the Board concluded the application: (i) promotes a revitalization of the property and enhances the downtown business district of the Borough in accordance with the Master Plan which benefits the business owners and community at large; (ii) the site is particularly suited for the proposed application because it provides commercial retail use with mixed residential use consistent with the permitted uses in the B-1 Zone; (iii) provides on-site parking in excess of the parking requirements which will promote use of the downtown business district; and (iv) provides for a desirable visual environment through creative development techniques, which promotes the purposes of zoning. The Board also concluded the "requested bulk variances are, in part, required or necessitated by the unique location of the site." The Board required, as a condition of approval, that plaintiff "shall provide a [d]eed of [c]onsolidation to combine Lots 5, 6, 9 and 11 into one . . . tax lot," which resulted in the formation of Lot 5.01.

In January 2018, the Board granted Plaintiff amended site plan approval, use variance approval, and several bulk variances to: (1) maintain the two existing two-story mixed-use commercial buildings with apartments above on Bridge Avenue originally planned to be demolished; (2) build the previously approved two-family residential duplex on Lake Avenue; and (3) construct four

4

new retail buildings (down from the previously approved seven) ("2018 Approval"). The Board made similar findings to those in 2015 and determined the purposes of the MLUL would be advanced, the benefits substantially outweigh any detriment, special reasons exist to grant the variances requested, and the variances can be granted without substantial detriment to the public good and without substantial impairment to the intent and purpose of the Master Plan or Zoning Ordinance. The approval also required a loading area.

Then, by resolution dated May 16, 2018, the Board granted Playa Bowls, LLC, a use and parking variance to operate a restaurant in one of the two existing mixed-use structures on Bridge Avenue ("Playa Bowls Approval"). The Board also granted a parking variance, where twenty-five parking spaces were required, but twenty-two parking spaces were proposed. Regarding the loading zone, the Board decided that rather than requiring plaintiff to install two loading spaces, as required by Ordinance, it directed Playa Bowls to use the "yellow stripe loading zone, located on Bridge Avenue" in front of Charlie's Restaurant, and limited the deliveries to vehicles no larger than a box truck or van. If the loading zone was unavailable, then delivery drivers were permitted to use "the driveway located between the subject property and the adjacent property."

In April 2020, plaintiff submitted the 2020 Application. This plan involved the construction of a three-story building consisting of ground floor parking, five retail units on the second floor, and two apartments on the upper level in lieu of the previously approved four retail units in the 2018 Approval.

At the time plaintiff filed the 2020 Application, the residential duplex approved by the 2018 Approval had already been constructed and was occupied, and the two existing buildings on Bridge Avenue had been renovated. One of those properties housed Playa Bowls, and both that property and the neighboring one had a second-floor apartment. What remained to be constructed was essentially the centrally located multi-unit retail building.

Plaintiff also requested two use variances with respect to: (1) exceeding the maximum height of a principal structure by more than ten percent where thirty-two-and-one-half feet is permitted, and thirty-six-and-one-half feet was proposed; and (2) permitting two residential units above the proposed five retail units. Further, plaintiff requested three new bulk variances (not previously granted under the 2018 Approval) related to: (1) minimum number of on-site loading areas where two are required, and none were proposed; (2) maximum number of stories where two-and-one-half stories are permitted, and three stories

6 <span>A-0899-22</span>

were proposed; and (3) minimum number of parking spaces where twenty-five spaces are required, and twenty-four spaces were proposed.[1]

A hearing on plaintiff's 2020 Application was held over the course of five days between December 2020 and July 2021. Plaintiff introduced numerous exhibits and presented the testimony of several expert witnesses, including a site engineer, traffic engineer, licensed architect, the architect's project manager, plaintiff's representative, and a licensed professional planner. The Board's professionals also testified along with two objectors represented by counsel, and members of the public made comments opposing the application.

In response to the objections made during the hearings, plaintiff amended the 2020 Application on March 17, 2021, by reducing the number of retail units on the second floor from five to four, reducing the number of apartments on the third floor from two to one, complying with the maximum height ordinance by removing a "cupola" altogether, relocating a trash enclosure to inside of the

---

[1] Plaintiff also sought relief for the already constructed residential duplex for minor deviations from previously granted bulk variances discovered after the structure was completed with respect to various minimal deviations in setbacks. Plaintiff also sought several bulk variances that were previously granted by the 2018 Approval, which remained unchanged by the 2020 Application, as well as two deviations for an existing garage proposed to be removed in the 2018 Approval but to remain in the 2020 Application. These variances are not contested on appeal by the Board.

A-0899-22

building, adding a turnaround for improved circulation, and reducing the number of seats in Playa Bowls, thereby eliminating the need for a parking variance.

Accordingly, by the time the Board voted on plaintiff's 2020 Application in July 2021, the only new variances requested were as follows: (a) a "d-1" variance to permit one residential unit above the four retail stores; (b) a bulk variance to exceed the maximum number of stories, where two-and-one-half stories are permitted and three stories were proposed; (c) a bulk variance with respect to providing two loading areas on the property, where none were proposed; and (d) the two bulk variances for minor deviations related to the already constructed residential duplex. All other deviations related to the 2020 Application were either previously granted by the 2015 and 2018 Approvals or were existing nonconformities.

During the hearing, plaintiff's witnesses testified that: (a) shifting the proposed building sixty-seven feet back from Lake Avenue, where the 2018 Approval has the building only eleven to twelve feet off Lake Avenue, substantially lessens the visual impact on the Lake Avenue residents; (b) the architectural design is more consistent in keeping with the architecture of Bay Head; (c) there is improved public access and greater visibility to Scow Ditch and Twilight Lake since the ground floor parking is higher, and there is no wall

8

or similar structure to block the view; (d) the drive aisle width has been widened from the approved twenty-and-one-half feet to the now proposed twenty-four feet enhancing site circulation; and (e) an existing parking deviation is eliminated, where the 2018 Approval was short three spaces.

Plaintiff's engineering expert, James Kennedy, testified the previously approved loading area was eliminated to provide for more parking and to eliminate the need for a parking variance and that all of the businesses and the residential parking lot will use the loading zone on Bridge Avenue in front of Charlie's Restaurant. Accordingly, there will be no loading zones on the property. John Rea, another professional engineer for plaintiff, acknowledged that his observations of the use of the loading zone were made in May 2021, and that the loading zone could be busier during the summer months. He was also aware trucks were parking on the corner of Bridge and Lake Avenues to make deliveries.

Approximately thirty individuals gave public comments. The members of the public were concerned with off-site traffic—including truck traffic—and parking, noise, trash, and flooding.

The objectors retained a professional planner, James Miller, to oppose the 2020 Application. He opined: (1) plaintiff's 2020 Application required a use

9

variance for the residential unit, as a lot in B-1 Zone can have one residential unit, and this lot has already had four residential units, with a fifth unit proposed; (2) plaintiff failed to meet its burden with respect to the proofs necessary to demonstrate that both the positive and negative criteria with respect to the allegedly required use variance, the two new bulk variances (stories and loading zones), and the variances previously granted under the 2015 and 2018 Approvals; (3) no purposes of zoning are advanced; and (4) there would be a negative impact on the surrounding neighborhood. He further testified the application requires two loading areas, but none were provided, and the proposed development overloads the site by putting pressure on one loading zone. He further noted the proposal with a deep setback gives the project a strip mall-type feel, inconsistent with the B-1 Zone.

On September 22, 2021, the Board issued a resolution memorializing its July 26, 2021 decision. The Board denied the 2020 Application determining: (1) "the Applicant will not suffer undue hardship by strict application of the Zoning Ordinance requirements;" (2) "the purposes of the [MLUL] would not be advanced by a deviation from the Zoning Ordinance requirements and the benefits of the deviation would not substantially outweigh any detriment;" and (3) "the variances requested by the Applicant cannot be granted without

substantial detriment to the public good and will substantially impair the intent and purpose of the Zone Plan, Master Plan and/or Land Use Ordinances of the Borough of Bay Head."

Thereafter, plaintiff appealed to the trial court asserting the Board's denial was arbitrary, capricious, and unreasonable.

On October 11, 2022, the trial court held that the Board's denial of the 2020 Application was arbitrary, capricious, and unreasonable. The court determined use variance relief was not required with respect to the 2020 Application's proposal to construct the single residential unit in the centrally located building/retail center. The court found that the proposed four-unit retail building was a permitted use, previously approved by the Board. The single residential unit was the only addition. The court concluded use variance relief was unnecessary, as the addition of the single residential unit contained in the building was wholly consistent with the purpose and intent of the Borough's Ordinance. Although, this added a fifth residential unit on lot 5.01, the court noted that when "the Board ordered the lot consolidation, it did so recognizing [the] 'Shoppers Village' . . . project should be developed as one complete project." It stated, "[t]he consolidation of the multiple uses and structures into one lot, however, is a significant deviation from the provisions of the ordinance

that limited primary structures to one per lot and one apartment wholly incorporated within that individual building." It further noted, "[t]he court is required to consider the history of the development of this property, which allowed several primary uses on the lot."

The court indicated the four-unit retail building was a permitted use, given the history of approvals and the reduced footprint of the amendment. It further noted the amendment was "clearly [an] advantageous change." The court observed because "there are authorized multiple uses on the single lot," it must consider extraneous facts to interpret the application of Bay Head, NJ, Ordinance §147-6(M). The court noted the Board "erred in determining that [p]laintiff needed a use variance to construct the single residential unit" based on the "plain language of [Ordinance §147-6(M) and] the history of approvals authorizing more than one principal use on the property."

The court further explained, even if a use variance was required to permit the residential unit, plaintiff presented sufficient proofs to satisfy the positive and negative criteria. The court found, under the positive criteria, the general welfare was advanced given the Board's prior approvals for the project. More particularly, the court noted the property was suited for the proposed use emphasizing the Board mandated lot consolidation and anticipated multiple uses

for the oversized, 30,000-plus square foot parcel, where the minimum lot size in the B-1 Zone is 5,000 square feet. The court also noted the unusual location and dimensions of the property, which has two frontages along Bridge and Lake Avenues, frontages along two bodies of water, Scow Ditch and Twilight Lake, and eleven sides with various pre-existing structures existing on the property; and the prior Board approvals that authorized multiple uses and structures to develop "Shopper's Village" which "supports a finding that the property . . . is particularly suited" for the "mixed retail and residential use within one retail building."

Additionally, the court relied on the expert testimony offered by plaintiff's experts. Specifically, the court noted plaintiff's planner testified a residential apartment above the retail units is consistent with the development pattern of the downtown area. The court also found plaintiff demonstrated the application promoted several purposes under the MLUL. N.J.S.A. 40:55D-2. The court cited to plaintiff's planner, who opined that in granting a use variance, the purposes of zoning under N.J.S.A. 40:55D-2 were advanced through: "(a) promotion of appropriate population densities; (b) providing sufficient space for a variety of uses, including residential and commercial; (c) promotion of a

desirable visual environment; and (d) allowing for an efficient use of land."

N.J.S.A. 40:55D-2(e), (g), (i) and (m).

The court noted plaintiff also satisfied the negative criteria as the use variance was not inconsistent with the purposes of the Master Plan or Zoning Ordinance. The trial court recognized plaintiff's assertion that there can be no substantial detriment to the public good where the record demonstrated the 2020 Application significantly improved the 2018 Approval. The 2018 Approval allowed for a larger building and much closer to Lake Avenue, whereas the 2020 Application allows for a smaller building and greater setbacks. The trial court further noted the 2020 Application not only complies with, but also advances the Borough's Master Plan by allowing for four new boutique-style shops in the B-1 Zone and improving public access and visibility to Scow Ditch and Twilight Lake.

The trial court further concluded relief for bulk variances previously granted under the 2015 or 2018 Approvals was unnecessary because these variances run with the land. DeFelice v. Zoning Bd. of Adjustment of Borough of Point Pleasant Beach, 216 N.J. Super. 377, 381 (App. Div. 1987). The court noted that because these variances run with the land, they had already been granted by the Board, satisfying the positive and negative criteria. The court

also noted, and the Board's attorney did not dispute, that plaintiff retains the right to finalize the construction as approved in the 2018 construction, regardless of the court's decision on the appeal. Price v. Martinetti, 471 N.J. Super 290, 291 (App. Div. 2011); D.L. Real Est. Holdings, LLC v. Point Pleasant Beach Plan. Bd., 176 N.J. 126 (2003). The court determined plaintiff met its burden during the hearing to satisfy the positive and negative criteria for the bulk variances for the maximum number of stories and the loading area.

The trial court observed that plaintiff had a right to seek modifications to a previously approved plan that may better suit the property and cautioned against precluding developers from seeking improvements to a previously approved plan for fear a denial would obliterate the prior approval. The trial court emphasized the Board's failure to approve a modification of a site plan "that would bring [the site plan] more greatly into conformance with the surrounding area . . . , and minimize its impact upon the residential owners along Lake Avenue, is unreasonable and therefore subject to reversal by this court." The court found that plaintiff's 2020 Application brought its previously approved site plan into greater conformance with the surrounding area and minimized impact on neighbors by reducing the building's footprint, largely

A-0899-22

increasing the setback of the new building from Lake Avenue, and lessening the impact of traffic, light, and noise to Lake Avenue residents.

Concerning the bulk variance for the number of stories, the court acknowledged the building conforms with the maximum height permitted in the B-1 Zone and raised a question whether the retail center is actually three stories as asserted by the Board, as the elevation of the building to afford under-building parking may not be considered a "story" for calculating the two-and-one-half story maximum requirement.

Regarding the loading area issue, the court noted "[p]laintiff proposed no loading zones on site and instead proposed to rely upon the previously approved loading zone on Bridge Avenue, that services Charlie's Restaurant and . . . Playa [B]owls." The court stated:

> The Board had previously approved this arrangement with limits on the size of the trucks and vehicles that used this zone. The Board now reverses itself to require two on-site off-street loading areas within the site to meet the demands of the six retail uses and five residential units. . . . Although the size of the property at 31,697 square feet may allow for compliance with the requirements of the ordinance, i.e., two loading areas on site, the Board was comfortable for the servicing of all the already approved retail uses that the Bridge Avenue loading zone would be adequate.

Ultimately, as the trial court noted:

A-0899-22

the court finds that the addition of the single residential apartment to the plan, which previously approved four retail units in the single building yet to be constructed, does not permit the Board to reconsider its decision, which included those units, to authorize off[-]site delivery service within the loading zone on Bridge Avenue, in lieu of two zones within the project site.

Therefore, the trial court held that the Board's denial of the 2020 Application was arbitrary, capricious, and unreasonable.

II.

On appeal, the Board argues trial court erred in finding the proposed residential unit did not require a N.J.S.A. 40:55D-70(d)(1) use variance and that even if a use variance was not required, it erred in concluding plaintiff satisfied the positive and negative criteria for a use variance. The Board further argues the trial court abused its discretion in finding plaintiff met its burden of proof as to the positive and negative criteria for bulk variance relief of the story and loading zone requirements. Ultimately, the Board argues its decision was supported by credible evidence and was not arbitrary, capricious, or unreasonable.

Our standard of review of a trial court's decision to reverse a local planning Board's denial of a development application is well-settled. "When reviewing a trial [judge's] decision regarding the validity of a local board's

determination, 'we are bound by the same standards as was the trial [judge].'" Jacoby v. Zoning Bd. of Adj. of Borough of Englewood Cliffs, 442 N.J. Super. 450, 462 (App. Div. 2015) (quoting Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004)). As such, "when a party challenges a . . . board's decision through an action in lieu of prerogative writs, the . . . board's decision is entitled to deference." Kane Props., LLC v. City of Hoboken, 214 N.J. 199, 229 (2013). Thus, we must "give deference to the actions and factual findings of local boards and may not disturb such findings unless they [are] arbitrary, capricious, or unreasonable." Jacoby, 442 N.J. Super. at 462. Local zoning boards have "peculiar knowledge of local conditions" and must be afforded "wide latitude in the exercise of delegated discretion." Kramer v. Bd. of Adjustment, 45 N.J. 268, 296 (1965).

However, the planning board's or "the trial judge's determination as to the meaning of [an] ordinance is not entitled to any deference" on appeal. Dunbar Homes, Inc. v. Zoning Bd. of Adj. of Twp. of Franklin, 448 N.J. Super. 583, 595 (App. Div. 2017). That is because "construing the meaning of a statute, an ordinance, or our case law," is a question of law subject to de novo review. 388 Route 22 Readington Realty Holdings, LLC v. Twp. of Readington, 221 N.J. 318, 338 (2015). Planning boards have "'no peculiar skill superior to the courts'

regarding purely legal matters." Dunbar Homes, Inc. v. Zoning Bd. of Adj. of Twp. of Franklin, 233 N.J. 546, 559 (2018) (quoting Chicalese v. Monroe Twp. Plan. Bd., 334 N.J. Super. 413, 419 (Law Div. 2000)).

A.

The Board contends that the trial court erred in finding that a (d)(1) use variance was not required for a "fifth" residential unit on the consolidated lot and § 147-6(M) of the Municipal Land Use Code of the Borough limits a lot to one residential unit in the B-1 Zone.

The trial court framed the issue as "whether . . . the ordinance carve[s] out the right to have a residential use, totally contained within the principal structure of the [four] unit retail" structure where the Board has "required lot consolidation" authorizing "more than one principal use on the lot (two pre-existing buildings with business use on the first floor and residential uses on the second[,] a two family duplex, and a [four] unit retail structure)."

The Legislature has delegated to municipalities the power to regulate local land use through the MLUL, N.J.S.A. 40:55D-1 to -163. Here, the relevant permissible variance under the MLUL pursuant to N.J.S.A. 40:55D-70(d) includes: "(1) a use or principal structure in a district restricted against such use or principal structure . . . ." N.J.S.A. 40:55D-70(d)(1). The property at issue is

located in the B-1 Zone of the Borough Zoning Map which, pursuant to §147-6(K) of the Municipal Land Use Code of the Borough, provides:  "No structure shall be erected, structurally altered, rebuilt, added to or enlarged for use as an apartment . . . ."

However, Borough Ordinance § 147-6(M) states:

> There shall be only one principal use on any lot, except that in a business zone more than one principal use may exist within a single building, provided that there is a minimum of 500 square feet per principal use.  <u>A lot in the business zone shall be allowed to have one residential unit.  The residential unit must be contained within and be part of the principal structure permitted for the business use.</u>

(Emphasis added).

Plaintiff asserts the plain language of § 147-6(M) permits a residential unit in the B-1 Zone, provided it is part of the principal structure and does not require a use variance.  In rejecting the 2020 Application, the Board concluded § 147-6(M) makes clear that in the business zone, a lot shall be allowed to have one residential unit and the 2020 Application proposed five residential units in one lot, which would not be a permitted use and requires a variance.  However, the trial court found "[t]he consolidation of the multiple uses and structures into one lot . . . is a significant deviation from the provisions of the ordinance that limited primary structures to one per lot and one apartment wholly incorporated

20

within that individual building." Additionally, the court noted the consolidation resulted in the property being more than six times the lot size required in a B-1 Zone. Moreover, the prior buildings on the lot were permitted by prior use variances, and the additional apartment above the yet-to-be-constructed retail structures was consistent with the ordinance as the other units are not part of the new retail structure. The trial court found that because the Board previously "authorized multiple primary uses on the single [consolidated] lot, then it [was] the role of the court to consider extraneous facts to interpret the application of [the] ordinance."

In interpreting a municipal ordinance, neither the Board nor the trial judge is entitled to deference on this question of law. See Dunbar Homes, 448 N.J. Super. at 595. "The established rules of statutory construction govern the interpretation of a municipal ordinance." State, Twp. of Pennsauken v. Schad, 160 N.J. 156, 170 (1999). "[W]e focus on the plain language of the statute and use common sense 'to effectuate the legislative purpose[.]'" Dunbar Homes, 448 N.J. Super. at 598 (quoting Morristown Assocs. v. Grant Oil Co., 220 N.J. 360, 380 (2015)). If the text, however, is susceptible to different interpretations, the court considers extrinsic factors, such as the statute's purpose, legislative

21

history, and statutory context to ascertain the Legislature's intent.  Schad, 160 N.J. at 170.

"Zoning ordinances generally are liberally construed in favor of the municipality."  Id. at 171 (quoting Place v. Bd. of Adjustment of Borough of Saddle River, 42 N.J. 324, 328 (1964)).  "However, '[z]oning regulations are restrictive of property rights and ought not to be too broadly interpreted against the possessor thereof.'"  Mountain Hill, LLC v. Zoning Bd. of Adjustment of Twp. of Middletown, 403 N.J. Super. 210, 236 (App. Div. 2008) (alteration in original) (quoting Skinner v. Zoning Bd. of Adjustment of Twp. of Cherry Hill, 80 N.J. Super. 380, 388 (App. Div. 1963)).  "Thus, '[r]estrictions in zoning ordinances must be clearly expressed and doubts are resolved in favor of the property owner.'"  Ibid. (alteration in original) (quoting Graves v. Bloomfield Planning Bd., 97 N.J. Super. 306, 312 (Law Div. 1967)).

We affirm the trial court's ruling regarding its determination that the Board acted unreasonably in denying plaintiff's application for a residential unit above the yet-to-be-built retail structure.  Here the trial court interpreted "[t]he plain language of the ordinance, the history of approvals authorizing more than one principal use on the property[,] and the extrinsic considerations in analyzing the purpose of § 147-6(M)," and ultimately concluded that this specific

22

residential use was permitted without a use variance. In doing so, the trial court considered "whether such a narrow interpretation of the zoning ordinance actually applies in this case, where the Board has approved on three prior applications multiple uses on this single commercial or business use lot." The trial court noted, "[c]learly in the B-1 zone, the ordinance did not anticipate the situation as is presented here, where an application for multiple uses in a comprehensive plan would advance the purposes of zoning on three prior applications for modification."

The Board further argues the court improperly relied on the prior approvals issued by the Board. It contends the 2018 Approval is not relevant to the 2020 Application and relies on Kramer, 45 N.J. at 284, for the proposition that a board's function is to decide each application strictly on the basis of the evidence presented for that particular application.

Although the Kramer Court noted a board "may not act upon facts which are not part of the record," it made clear "the Board . . . is not obligated to function in a vacuum." Ibid. Furthermore, as plaintiff persuasively argues "neither a Board, nor a [t]rial [c]ourt tasked with review of a board's decision, can consider an 'amended preliminary and final major site plan' application, without considering what was previously approved and what might be

A-0899-22

amended." (Emphasis added). Here, the 2015 and 2018 Approvals were part of the record and part of plaintiff's amended site plan application and were reasonably considered by the court in rendering its decision. Viewing the 2020 Application in the context of the purpose of the ordinance, the prior history of approvals, the Board's prior approval of multiple multi-use structures on the lot, the requirement that the lot be consolidated coupled with the size of the lot, "[t]he addition of the proposed one residential unit wholly contained within this otherwise conforming structure . . . is consistent with the purpose and intent of the ordinance." We discern no error in the trial court's determination a use variance was not required.

B.

Notwithstanding our finding that a use variance was not required, we proceed to address whether plaintiff met its burden of establishing the negative and positive criteria under N.J.S.A. 40:55D-70(d). The Board argues plaintiff failed to meet its burden of establishing the positive and negative criteria and asserts the location of the property was not particularly suited for the proposed development, which was not in keeping with the character of Bay Head.

With respect to obtaining use variances, the law prescribes that an applicant has an enhanced burden. The applicable statute provides:

24

No variance or other relief may be granted under the terms of this section . . . without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

[N.J.S.A. 40:55D-70(d).]

The grant of a use variance pursuant to this section requires proof of both "positive and negative criteria." Sica v. Bd. of Adjustment of Wall, 127 N.J. 152, 156 (1992).

When an applicant seeks a use variance, it must demonstrate special reasons for granting the variance under the MLUL. N.J.S.A. 40:55D-70(d)(1). These "special reasons" are referred to as the "positive" criteria. The Supreme Court has identified three categories of circumstances where special reasons may be found:

(1) where the proposed use inherently serves the public good, such as a school, hospital or public housing facility; (2) where the property owner would suffer "undue hardship" if compelled to use the property in conformity with the permitted uses in the zone; and (3) where the use would serve the general welfare because "the proposed site is particularly suitable for the proposed use."

[Nuckel v. Little Ferry Planning Bd., 208 N.J. 95, 102 (2011).]

25

The parties and the trial court focused their attention on category three.  Here, the use does not inherently serve the public good, and there is no claim of undue hardship by plaintiff under the (d)(1) use variance analysis; therefore, the court's decision rested on whether the use would serve the general welfare because the site is particularly suitable for the proposed use.

Meeting any of the MLUL purposes listed in N.J.S.A 40:55D-2 has consistently been construed as "serv[ing] the general welfare."  Burbridge v. Twp. of Mine Hill, 117 N.J. 376, 386 (1990).  The Board's resolution, citing N.J.S.A. 40:55D-2(a), found the 2020 Application did not meet "the intent and purpose of the [MLUL] to encourage municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals" and serve the general welfare.  The Board found that the application was a substantial overutilization of the lot contrary to public health, safety, and the general welfare.

The trial court noted that plaintiff need only advance one purpose of the MLUL.  N.J.S.A. 40:55D-2.  The court ultimately found plaintiff advanced four purposes of the MLUL.  The court relied on plaintiff's planner's testimony that the purposes of zoning under N.J.S.A. 40:55D-2 were advanced by granting the variance, specifically through:  "(a) promotion of appropriate population

densities; (b) providing sufficient space for a variety of uses, including residential and commercial; (c) promotion of a desirable visual environment; and (d) allowing for an efficient use of the land." N.J.S.A. 40:55D-2(e), (g), (i) and (m). Additionally, the court observed this property was particularly suited for the project, based in part, on the Board's prior approvals and findings that the project met positive and negative criteria and promoted the purposes of zoning. Moreover, the court noted the unusual dimension of the lot, its location on two different streets, and the lot's excess size (31,697 square feet compared to the 5,000 square foot minimum) supported a finding the lot was particularly suited for the use.

Regarding whether the site was "particularly suitable" for the project, the Board argues that it "considered the testimony of . . . Miller that this site [was] not particularly suited to permit the application as designed." He testified that the proposed addition of a three-story structure with parking at ground level beneath the second floor, four retail spaces on a second floor, and an apartment on a third floor was inconsistent with the Master Plan and the bulk requirements of the Land Use Ordinance, which limits the height of any building to two-and-one-half stories. Furthermore, the Board argues that the 2020 Application constituted a substantial and significant change from the 2018 Approval—in

27

adding the residential unit—necessitating that the Board undertake the analysis mandated by <u>Medici v. BPR Co.</u>, an analysis that the Board was not required to perform when it approved the 2018 Application.  107 N.J. 1 (1987).

Plaintiff argues that this site is particularly suitable for a residential unit based on their planner's testimony that the site was unique in shape and size. Plaintiff's planner testified that providing a residential apartment above retail is consistent with the development pattern of the downtown, where a number of similar retail structures contain apartments above, demonstrating that this type of mixed-use is permitted and exists in the downtown area of Bay Head. Plaintiff's planner testified the 2018 Approval, which permitted the construction of a four retail unit structure, allowed for much more mass, a larger building footprint, and was situated much closer to Lake Avenue.  Plaintiff asserts that given the Board's prior approval for a much larger development closer to Lake Avenue, it should have also determined the smaller development with greater setbacks was particularly suitable for the property.

Most notable, the Board itself previously found, when it considered and approved the 2015 and 2018 applications, that the plan was consistent with the development plan of the surrounding areas, "because [the plans] provide[] for commercial retail use with mixed residential use consistent with the permitted

uses in the [B-1] Zone."  The only difference between the 2020 Application and the 2018 Approval is that the 2018 building was much larger, and the 2020 Application proposes an additional residential unit.

The court did not err in finding the Board's decision to deny the 2020 Application—by reasoning the building was not particularly suitable for the site—was arbitrary, capricious, or unreasonable, where the Board had previously found the proposed building under the 2018 Approval particularly suitable.  The proposal under the 2018 Application involved a larger development and was much closer to Lake Avenue.  Given the approval for the 2018 Application, the court was correct in finding a smaller less intrusive building was also particularly suitable for property and should also have been approved.  In sum, the trial court was correct in finding plaintiff presented sufficient credible evidence to support a conclusion that it met the positive criteria that the building is particularly suitable for the property.

An applicant for a use variance must also satisfy what are known as the "negative criteria."  Specifically, an applicant must show with "enhanced quality of proof" that the variance can (a) "be granted without substantial detriment to the public good," and that (b) it "will not substantially impair the intent and the purpose of the zone plan and zoning ordinance."  Price v. Himeji, LLC, 214 N.J.

263, 286 (2013) (quoting N.J.S.A. 40:55D-70). "The showing required to satisfy the first of the negative criteria focuses on the effect that granting the variance would have on the surrounding properties." Ibid. (citing Medici, 107 N.J. at 22 n.12). "The proof required for the second of the negative criteria must reconcile the grant of the variance for the specific project at the designated site with the municipality's contrary determination about the permitted uses as expressed through its zoning ordinance." Ibid. (citing Medici, 107 N.J. at 21). This requires, "in addition to proof of special reasons, an enhanced quality of proof and clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Medici, 107 N.J. at 21.

In addressing the negative criteria, the board must evaluate the impact of the proposed use variance on the adjacent properties and determine whether or not it will cause "substantial detriment to the public good." Id. at 22. "The key word . . . is 'substantially,'" meaning that if the Board concludes "that the harms, if any, are not substantial, and impliedly determines that the benefits preponderate, the variance stands." Yahnel v. Bd. of Adjustment of Jamesburg, 79 N.J. Super. 509, 519 (App. Div. 1963).

Here, the court determined plaintiff satisfied the negative criteria as the use variance was not inconsistent with the purposes of the Master Plan or Zoning Ordinance. The trial court observed that there can be no substantial detriment to the public good where the record demonstrated the 2020 Application significantly improved the 2018 Approval. The 2018 Approval allowed for a larger building and much closer setback—eleven or twelve feet—from Lake Avenue, whereas the 2020 Application allows for a smaller building and setback of sixty-seven feet from Lake Avenue. The 2020 Application also eliminated the need for a parking variance, and the trial court further stated the 2020 Application not only complies with, but also advances, the Borough's Master Plan by allowing for four new boutique-style shops in the B-1 Zone and improving public access and visibility to Scow Ditch and Twilight Lake. In short, the court determined the 2020 Application reduced the size and improved upon a previously approved building.

As plaintiff's planner emphasized, these shops with one residential unit are exactly what is commonly found in the downtown of Bay Head. The trial court concluded that this prong was satisfied as "[t]he Board found ample support in the past that the applicant met the positive and negative criteria to support the grant of a variance . . . ."

31

In sum, the trial judge did not err in reversing the Board's decision because plaintiff made an adequate showing that the positive and negative criteria were met for this (d)(1) use variance, and the Board's denial on that basis was arbitrary, capricious, or unreasonable.

C.

1.

The Board next argues its finding that plaintiff failed to demonstrate the positive and negative criteria for bulk variance relief for a three-story structure—wherein two and half stories is permitted—was supported by credible evidence. Plaintiff sought a "c" variance under N.J.S.A. 40:55D-70(c).

Under N.J.S.A. 40:55D-70(c), two separate provisions justify the grant of bulk variances, N.J.S.A. 40:55D-70(c)(1) and (c)(2). The (c)(1) provision authorizes bulk variances in cases of "hardship," and subsection (c)(2) authorizes variances where the purposes of the MLUL would be advanced, and the benefits of the deviation outweigh any detriments, often called flexible C variances. Kaufmann v. Planning Bd. for Warren Twp., 110 N.J. 551, 558-60 (1988). Both (c)(1) and (c)(2) require proof of the negative criteria, which consists of the absence of substantial detriment to the public good, and to the Master Plan and Zoning Ordinance. Bressman v. Gash, 131 N.J. 517, 523

(1993). For all variances, the applicant bears the burden of proving the positive and negative criteria. Ten Stary Dom P'ship v. Mauro, 216 N.J. 16, 30 (2013).

N.J.S.A. 40:55D-70(c)(1) states, in relevant part, that a Board has the power to grant variances:

> Where: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation . . . would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property, grant, upon an application or an appeal relating to such property, a variance from such strict application of such regulation so as to relieve such difficulties or hardship . . . .

Essentially, under subsection (c)(1), an applicant must show that exceptional or undue hardship will result if the variance is not granted, the so-called positive criteria. Chirichello v. Zoning Bd. of Adjustment, 78 N.J. 544, 552 (1979). What is essential is that the unique condition of the property must be the cause of the hardship claimed by the applicant. Lang v. Zoning Bd. of Adjustment, 160 N.J. 41, 56 (1999).

The hardship criteria of a (c)(1) variance is unaffected by personal hardship, financial or otherwise. Ten Stary, 216 N.J. at 29. The focus is

"whether the strict enforcement of the ordinance would cause undue hardship because of the unique or exceptional conditions of the specific property." Lang, 160 N.J. at 53. The hardship standard does not require the applicant to prove that without the variance the property would be zoned into inutility. Id. at 54. The applicant need only demonstrate the property's unique characteristics inhibit the extent to which the property can be used. Id. at 55.

For a flexible C variance, N.J.S.A. 40:50D-70(c)(2) states in relevant part:

> where in an application or appeal relating to a specific piece of property the purposes of this act . . . would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, [the Board may] grant a variance to allow departure from regulations . . . provided, however, that the fact that a proposed use is an inherently beneficial use shall not be dispositive of a decision on a variance under this subsection and provided that no variance from those departures enumerated in subsection d. of this section shall be granted under this subsection; and provided further that the proposed development does not require approval by the planning board of a subdivision, site plan or conditional use, in conjunction with which the planning board has power to review a request for a variance . . . .

A (c)(2) variance, then, is not based upon the "hardship" but "requires a balancing of the benefits and detriments from the grant of the variance." Bressman, 131 N.J. at 523. The analysis focuses on advancing the purposes of the MLUL and the benefits to the community.

A-0899-22

In sum, the application for a variance under (c)(2) requires:

> (1) [that it] relate[] to a specific piece of property; (2) that the purposes of the [MLUL] would be advanced by a deviation from the zoning ordinance requirement; (3) that the variance can be granted without substantial detriment to the public good; (4) that the benefits of the deviation would substantially outweigh any detriment[;] and (5) that the variance will not substantially impair the intent and purpose of the zone plan and zoning ordinance.
>
> [Cox et al., New Jersey Zoning & Land Use Administration § 29-3.3 at 435 (2023) (citations omitted).]

The Board maintains plaintiff's request for a variance for a three-story building was a self-created harm, and the lighting plan submitted by plaintiff fails to confirm that the lighting from the garage area and parking lot will not interfere with the quiet enjoyment of the residents on Lake Avenue.

Plaintiff counters it satisfied positive criteria, and the court correctly noted the building complies with the maximum permitted height, the parking lot may not be a story for the purposes of calculating the two-and-a-half-story maximum, and plaintiff's planner found it consistent with other buildings in the B-1 zone. Moreover, the building is both shorter and smaller than the building in the 2018 Approval. Regarding the Board's argument concerning the lighting, plaintiff notes the lighting plan complied with all Borough lighting standards and codes,

and the visual impact was lessened from the 2018 Approval by shifting the building sixty-seven feet back from Lake Avenue, compared to the previous eleven feet.

Likewise, plaintiff asserts it satisfied the negative criteria because the building is consistent with the intent and purpose of the Master Plan and Zoning Ordinance, that a number of buildings on Bridge and Lake Avenues are actually taller than plaintiff's proposed building, and the 2020 Application improved on the already approved 2018 plan. Plaintiff's planner also presented the Board with testimony that the building design actually appears to be two stories, complies with the maximum building height under the Borough's Ordinance, is consistent with other buildings in the B-1 zone, and that the building design is more visually pleasing and in keeping with the character of the area.

Here, the court did not err in concluding plaintiff satisfied its burden for bulk variance relief from the number of stories. It determined, based on the record, plaintiff demonstrated that it satisfied the negative and positive criteria for relief from the maximum number of stories for the building where three stories was proposed and two-and-one-half stories was permitted, but where, as the trial court noted, the building complied with the maximum permitted height and where the underground parking might not be considered a "story" in

A-0899-22

calculating the two-and-one-half-story maximum. We discern no error, particularly in view of the smaller building—compared to the prior approval—increased setback from Lake Avenue, and less visual impact on the surrounding area.

2.

The Board next argues plaintiff failed to meet its burden to demonstrate the positive and negative criteria for bulk variance relief for zero loading zones, where two loading areas were required. Specifically, the Board argues there was substantial testimony as to the traffic problems that would be exacerbated by the new development and lack of on-site loading zones.

Section 147-63(A)(5) of the Borough Ordinance provides:

> The Planning Board shall grant site plan approval in the event the site plan complies with the following standards, regulations and requirements:
>
> . . . .
>
> Adequate provisions have been made for all parking, traffic circulation and pedestrian circulation in and about the property. All parking and traffic problems shall be resolved before approval.

The Board notes plaintiff failed to provide a traffic study to address the traffic that four additional retail businesses and a residential unit would generate. It

further pointed to the testimony of Miller and other witnesses, which revealed the large number of delivery vehicles not using the loading zone in front of Charlie's Restaurant, blocking pedestrian walkways, and double-parking on Bridge Avenue for the purpose of making deliveries to Charlie's Restaurant or Playa Bowls. Miller also noted the Bridge Avenue loading area was unable to accommodate delivery trucks during "intense periods of utilization," and was "fully occupied." It further notes plaintiff did not designate parking spaces for the employees of the four new retail businesses or for the 3,000 square foot residential unit, which would exacerbate the parking issues in the area of Bridge and Lake Avenues.

Regarding this loading zone, the trial court noted:

> Plaintiff proposed no loading zones on site and instead proposed to rely upon the previously approved loading zone on Bridge Avenue, that services Charlie's Restaurant and . . . Playa [B]owls. The Board had previously approved this arrangement with limits on the size of the trucks and vehicles that used this zone. The Board now reverses itself to require two on-site off-street loading areas within the site to meet the demands of the six retail uses and five residential units. The only difference from the prior approval however is that one new residential apartment is proposed.

The court appeared to be under the mistaken impression the 2018 Approval eliminated the need for any loading zones on the property because it

had allowed Playa Bowls to utilize the Charlie's Restaurant loading zone. However, the January 2018 Resolution required one loading area despite allowing Playa Bowls to use an off-site loading area in the May 2018 Playa Bowls Approval. Plaintiff's counsel agreed the 2018 Approval did not eliminate the need for a loading area separate and apart from the one in front of Charlie's Restaurant.

In short, because the court found the Board "reverse[d] itself to require two on-site off-street loading areas" when, in fact, a loading zone was required as part of the 2018 Approval, we remand for the court to consider the need for a loading zone for the purposes of the 2020 Application in the context of the 2018 Approval, which did not eliminate the requirement for a loading zone. It may be the court determines plaintiff is still entitled to a bulk variance to eliminate the loading zone. On the other hand, the court may find the Board did not act in an arbitrary or capricious manner in requiring the loading zones. We intimate no views on the appropriate outcome.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office

CLERK OF THE APPELLATE DIVISION

A-0899-22